1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11
12
13
14
15
16
17
18
19

NORTHWEST GROCERY
ASSOCIATION, an Oregon non-profit
organization, the WASHINGTON
FOOD INDUSTRY ASSOCIATION, a
Washington non-profit corporation,

Plaintiffs,

v.

CITY OF SEATTLE, a charter
municipality,

Defendant.

Case No.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

20
21
22
23

Plaintiff Northwest Grocery Association ("NWGA") and the Washington

Food Industry Association ("WFIA", collectively "Plaintiffs") bring this action

against Defendant City of Seattle ("Defendant" or "City") and allege as follows in

this Complaint for declaratory and injunctive relief:

24

## **INTRODUCTION**

25
26
27
28

1.      At the onset of the COVID-19 pandemic, the State of Washington

and the City of Seattle issued emergency orders and regulations in an effort to stem

the spread of the virus and protect the public health and welfare. These early

efforts—aimed at balancing the public's basic economic and social needs with a

desire to minimize COVID morbidity and mortality—came at a steep price, especially for essential businesses, and the millions of employees and members of the public who rely on them.

2.     Seattle grocers have stayed open to serve their communities since day one. They understand that defeating this pandemic requires extraordinary measures and have eagerly committed themselves to the task. Since March of 2020, Washington grocers of all sizes have established rigorous and science-driven safety measures, often at great expense, to adapt to this new environment and ensure that they operate in a safe and hygienic manner in order to help slow the spread of the virus, and protect their workers and the public.

3.     Grocers have implemented comprehensive safety measures for customers and employees and compensated frontline grocery employees for their extra efforts in a difficult environment.  Grocers have provided "appreciation pay," "hero bonuses," and "thank you pay" to reward their associates.  Grocers have offered COVID-19 testing to employees and provided emergency leave and paid time off to those affected by the virus or experiencing symptoms.

4.     For worker safety, grocers have provided face masks, gloves, and protective gear, and have encouraged employees to stay home if feeling ill.  Stores installed Plexiglass partitions, and contactless payment systems.  Physical distancing and touchless delivery services are commonly used to protect employees, Washington's largest grocers such as Kroger and Albertsons joined the United Food and Commercial Workers International union just last year to urge federal and state governments to designate grocery store employees as emergency first responders.

5.     On January 25, 2021, the Seattle City Council, after a series of speeches suggesting that not enough was being done to protect the health and welfare of grocery workers, passed the "Hazard Pay for Grocery Employees Ordinance" ("Ordinance").  The Ordinance requires employers to pay a $4 per hour

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

premium on the employees' existing wage at the time of enactment, effective immediately.

6. Plaintiffs seek a declaration that the law is invalid and unconstitutional, and an injunction halting any action to enforce the Ordinance on the grounds that it (1) is preempted by federal law regulating collective bargaining and unfair labor practices; (2) violates the equal protection and contracts clauses of the U.S. and Washington constitutions.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. §1331, as the Plaintiffs' claims arise under federal laws; namely, the National Labor Relations Act, 29 U.S.C. §141 *et seq.*; Article VI of the U.S. Constitution which designates the Constitution and Laws of the United States as the supreme law of the land; and the equal protection clause and contracts clause of the U.S. Constitution.

8. This Court has supplemental jurisdiction over this subject matter pursuant to 28 U.S.C. §1367(a), as the Plaintiffs' claims arising under the Washington Constitution are so closely related to the federal question claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

9. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as this Court is sited in the federal judicial district where the events giving rise to the NWGA's claims have occurred, are now occurring, and will occur in the future if not prevented through actions of this Court. WFIA's and NWGA's members are situated in this district and are and will continue to be adversely affected by the irreparable harms sought to be remedied and prevented by this Court's action upon this Complaint.

## PARTIES

10. Plaintiff Northwest Grocery Association has served as a

3

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

109682807.1 0099865-10005

representative and trade association for the grocery industry of Washington, Oregon, and Idaho by promoting the common interests of its membership.  As part of its mission, NWGA has advocated on behalf of its member retailers on important policy issues.  Headquartered in Lake Oswego, Oregon, NWGA brings this action on behalf of its members operating stores in the City of Seattle.

11.     Plaintiff Washington Food Industry Association is a non-profit corporation organized under the laws of Washington and headquartered in Olympia, Washington. WFIA's members include independent grocery stores, supermarkets, convenience stores, and their suppliers operating throughout Washington. WFIA represents the interests of its retailer and wholesaler members on state and local legislative issues that could upend their business operations, including labor, transportation, and tax issues.

12.     Defendant, City of Seattle, is and at all relevant times has been a municipal corporation chartered under authority conferred by the Constitution of the State of Washington, with powers to enact legislative measures as limited by applicable state, federal and constitutional law.

## FACTUAL BACKGROUND

13.     Northwest Grocery Association and Washington Food Industry Association pursue this action on behalf of their members who are grocery store employers ("Members") because the employers who operate grocery stores in Seattle will suffer a direct and adverse impact from the application of the Ordinance, and thus would have standing to pursue these claims in their own right. The policy and legal interest that NWGA and WFIA seek to protect is at the core of its mission, and the injunctive and declaratory relief sought does not require the participation of individual members.

14.     Several Members operate grocery stores in the City that employ members of a specific labor union, United Commercial Food Workers International, and those employees are parties to collective bargaining agreements that govern the

4

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

terms of their employment, including wage scales. Other Members operate grocery stores that do not employ unionized workers, but those employees are free to organize and select a collective bargaining unit, should they choose to do so.

15.     Members have suffered or will continue to suffer economic and non-economic harm as a result of the enactment of the Ordinance, and its foreseeable consequences on union organizing, ongoing collective bargaining, and labor relations for both unionized and non-union grocery stores in the City of Seattle. Members are required to alter the wage scales and other terms of their existing collective bargaining agreements, regardless of any additional hero pay, bonuses, or other non-monetary compensation provided to their employees to ease the burden of the COVID-19 pandemic.

16.     The Ordinance also prohibits an employer from taking any action related to the Ordinance that could "reduce employee compensation," effectively preventing the employer from taking any action to control labor costs, despite the government-mandated wage increases.  Failure to immediately comply with the Ordinance will expose the Members to civil sanctions, loss of goodwill, and other irreparable harm.

17.     UCFW sponsored this Ordinance. The national UCFW organization has been active in promoting and negotiating with employers for hero pay. Over the last two months, the national UCFW has made numerous statements in the press that hazard pay bonuses and other compensation are appropriate topics for bargaining, even announcing recent "victories" in negotiations with other grocery retailers in Washington, New Jersey, New York, and around the country where employers have agreed to pay supplemental hazard pay premiums.

18.     By design, the Ordinance picks winners and losers.  It singles out large grocery companies with unionized workforces (i.e., UCFW's members) without providing any reasonable justification for the exclusion of other employers or frontline retail workers. The Ordinance arbitrarily and improperly targets grocery

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
109682807.1 0099865-10005

store businesses in Seattle for disparate treatment while not requiring the same commitments from similarly situated businesses, or conferring *any* benefits on similarly situated employees.  There is no support for any of the City's statements that the Hazard Pay will protect public health, address economic insecurity, and promote job retention.

## THE ORDINANCE

19.    The Hazard Pay for Grocery Employees Ordinance codified in Sections  3.02.125 and 6.208.020 in the Seattle Municipal Code is attached hereto as **Exhibit A**.  It applies to "grocery stores" which is defined as a store that is "over 10,000 square feet in size and that is primarily engaged in retailing groceries for offsite consumption," or  "over 85,000 square feet and with 30 percent or more of its sales floor area dedicated to sale of groceries[.]" Section 100.010.  Specifically, the ordinance applies to those grocery stores that employ five hundred (500) or more grocery workers worldwide.  Section 100.020

20.    Grocery stores meeting this minimum threshold of employees are required to provide each employee with premium pay consisting of an additional four dollars ($4.00) per hour for each hour worked.  Section 100.025.  The Ordinance's pay requirements are in effect for the duration of the civil emergency proclaimed by the Mayor on March 3, 2020.  *Id.*

21.    The Ordinance prohibits reducing a grocery employee's compensation or limiting a grocery employee's earning capacity unless the employer can prove the decision would have happened in absence of the Ordinance. Section 100.025.

22.    Grocery stores are required to provide a notice of rights established by the Ordinance.  Section 100.030.

1

**FIRST CAUSE OF ACTION**

2

**Declaratory and Injunctive Relief**

3

**(NLRA Preemption)**

4        23.     Plaintiffs incorporates herein by this reference the allegations

5     contained in Paragraphs 1 through 22, inclusive.

6        24.     Enacted in 1935, the National Labor Relations Act ("NLRA"), as

7     amended, 29 U.S.C. § 151, *et seq*., creates a uniform federal body of law governing

8     union organizing, collective bargaining, and labor-management relations applicable

9     to employers engaged in interstate commerce.  It established various rules

10    concerning collective bargaining and defined a series of banned unfair labor

11    practices, including bans on interference with the formation or organization of labor

12    unions by employers. The NLRA does not apply to certain workers, including

13    supervisors, managerial employees and confidential employees – all categories

14    specifically excluded from the Ordinance.

15       25.     The NLRA prohibits state and local regulation of conduct that

16    Congress intended to be left to be controlled by the free-play of economic forces.

17    Legislation that interferes with the "balanced state of collective bargaining" is

18    preempted by the NLRA.  *See Machinists v. Wisconsin Employment Relations*

19    *Comm'n*, 427 U.S. 132 (1976).

20       26.     In particular, the NLRA preempts any and all state and local

21    enactments that, by design or consequence, regulate or interfere with the then-

22    existing balance of economic power between labor and management with respect to

23    zones of activity that, under federal labor law, are intended to be left to the free play

24    of economic forces. Laws subject to NLRA preemption include laws that interfere

25    with or attempt to regulate the economic tools available to labor or management

26    during the course of collective bargaining or that otherwise interfere with the

27    collective bargaining process, such as those that alter the parties' rights and

28    economic alternatives during collective bargaining, or the processes and procedures

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   utilized for union organizing.

2       27.     Application of the Ordinance to the activities of the Seattle

3   Members unequivocally intrudes upon zones of activity in the areas of labor

4   relations, union organizing, and collective bargaining that is reserved under federal

5   labor law and policy to the free play of economic forces.  The Ordinance establishes

6   premium pay standards that, by design or consequence, empower the UFCW or

7   other collective bargaining units to secure a wage rate they could not otherwise

8   have obtained from the employer at a unionized or non-union grocery store. This

9   undermines the collective bargaining process and disrupts the process of union

10  organizing.

11      28.     While the City has the ability to enact ordinances to further the

12  health and safety of its citizens, the Ordinance here bears no relation to those goals.

13  Local minimum wage laws, for example, seek to lessen the burden on public

14  welfare services. This ordinance is not a minimum labor standard.  It is a mandatory

15  hourly bonus for a specific group of workers, regardless of the wage negotiated in

16  the current collective bargaining agreements or other employment agreements.

17      29.     The Ordinance is preempted by the NLRA as it regulates zones of

18  activity that Congress intentionally left to be controlled by the free play of

19  economic forces.

20      30.     The City's application and enforcement of the Ordinance will cause

21  NWGA's Members to suffer irreparable harm for which they have no adequate

22  remedy at law, even if the Ordinance is later declared by this Court to be void and

23  unenforceable. This claim is also brought pursuant to 42 U.S.C. §1983 and

24  §1988(b).

25      31.     Plaintiffs are entitled to judgment declaring the Ordinance to be

26  void and unenforceable under the Supremacy Clause of the U.S. Constitution and

27  equitable and injunctive relief to prevent the City of Seattle or any other private

28  enforcer from attempting to enforce or give effect to the Ordinance.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

## SECOND CAUSE OF ACTION

2

### Declaratory and Injunctive Relief

3

### (Equal Protection Clause of the United States Constitution)

4      32.    Plaintiffs incorporate herein by this reference the allegations

5  contained in Paragraphs 1 through 31, inclusive.

6      33.    NWGA and WFIA hereby seek declaratory, equitable and

7  injunctive relief to prevent the City from depriving Plaintiff's members of the

8  protections afforded to them under the Equal Protection Clause of the U.S.

9  Constitution, which guarantee each and all of them equal protection of the laws.

10 (U.S. Const., Amend. XIV, § 1).  This claim is also brought pursuant to 42 U.S.C.

11 §1983 and §1988(b).

12      34.    The Equal Protection Clause requires that persons who are similarly

13 situated receive like treatment under the law, and that statutes may single out a class

14 for distinction only if that classification bears a rational relationship to the purpose

15 of the statute.  As such, the City may not irrationally single out one class of

16 individuals for discriminatory treatment.

17      35.    The Ordinance improperly singles out grocery store businesses in

18 Seattle for disparate treatment while not requiring the same treatment of similarly

19 situated businesses.  More importantly, the ordinance implicates the Members'

20 fundamental right to be free from unreasonable governmental interference with

21 their contracts, specifically their collective bargaining agreements and other

22 employment agreements.

23      36.    The stated purpose of the Ordinance, namely, to protect public

24 health, address economic insecurity, and promote job retention during the COVID-

25 19 emergency by requiring grocery stores to provide premium pay is not rationally

26 related to the discriminatory treatment of NWGA's Members.  No significant and

27 legitimate public purpose exists for the Ordinance.  The City's stated objectives are

28 merely an attempt to impose a public policy rationale on interest-group driven

9

legislation for labor unions and, in particular, for UFCW.

37.    By virtue of the foregoing, application of the Ordinance to WFIA and NWGA's Members within the City violates the equal protection guarantees of the U.S. Constitution.

38.    The City's application and enforcement of the Ordinance will cause Plaintiffs' members to suffer irreparable harm for which they have no adequate remedy at law, even if the Ordinance is later declared by this Court to be void and unenforceable.

## THIRD CAUSE OF ACTION

### Declaratory and Injunctive Relief

### (Equal Protection Clause of the Washington Constitution)

39.    NWGA incorporates herein by this reference the allegations contained in Paragraphs 1 through 37, inclusive.

40.    NWGA hereby seeks declaratory, equitable and injunctive relief to prevent the City from depriving NWGA's members of the protections afforded to them under the Equal Protection Clause of the Washington Constitution, which like the U.S. Constitution, guarantees each and all of them equal protection of the laws. (Wash. Const., Art. I § 12.)

41.    For the same reasons set forth in Paragraphs 31 through 37 above, the Ordinance violates the Equal Protection Clause of the Washington Constitution. Such application will cause NWGA's Members to suffer irreparable harm for which they have no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### For Declaratory and Injunctive Relief

### (Contracts Clause of the U.S. Constitution)

42.    Plaintiffs incorporate herein by this reference the allegations contained in Paragraphs 1 through 40, inclusive.

43.    Plaintiffs hereby seek declaratory, equitable and injunctive relief to

10

1  prevent the City from depriving Plaintiffs' Members of the protections afforded to

2  them under the Contracts Clause of the U.S. Constitution, which provides in

3  pertinent part that: "No State shall . . . pass any . . . Law impairing the Obligation of

4  Contracts . . . ." (U.S. Const., Art. I, § 10, cl. 1).  The Contract Clause imposes

5  limits upon the power of a State, and Municipalities operating under the color of

6  State law, to abridge existing contractual relationships, even in the exercise of its

7  otherwise legitimate police power.

8       44.    The Ordinance substantially interferes with Members' contracts,

9  including its collective bargaining agreements with its employees, without any

10  significant or legitimate public purpose. The City's stated objectives are to protect

11  public health, address economic insecurity, and promote job retention.  None of

12  these justifications support this measure, because the City's stated objectives are

13  merely an attempt to impose a public policy rationale on interest-group driven

14  legislation for labor unions and, in particular, for UFCW.

15       45.    Even if the City could show a significant and legitimate public

16  purpose behind the regulation, the substantial impairment to the Members'

17  contractual rights and obligations (i.e., the terms of the Members' existing

18  collective bargaining agreements) are neither reasonable nor necessary to fulfill any

19  such public purpose.

20       46.    By virtue of the foregoing, application of the Ordinance to

21  NWGA's members constitutes a substantial and unconstitutional impairment of

22  those members existing contractual relationships that will cause them to suffer

23  irreparable harm for which they have no adequate remedy at law.

24  ### FIFTH CAUSE OF ACTION

25  **Declaratory and Injunctive Relief**

26  **(Contracts Clause of the Washington Constitution)**

27       47.    Plaintiffs incorporate herein by this reference the allegations

28  contained in Paragraphs 1 through 45, inclusive.  Plaintiffs hereby seek declaratory

11

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    and injunctive relief to prevent the City from violating, and continuing to violate,

2    the Contract Clause of the Washington Constitution, which provides in pertinent

3    part that: "A ... law impairing the obligation of contracts may not be passed."

4    (Wash. Const., Art. I, § 23.)

5           48.    Like the Federal Contracts Clause, the Washington Contracts

6    Clause also imposes limits upon the State of Washington, and its municipalities, to

7    abridge existing contractual relationships, even in the exercise of its otherwise

8    legitimate police power.  For the same reasons set forth in Paragraphs 41 through

9    45 above, application of the Ordinance to Plaintiffs' members within the City

10   constitutes a substantial and unconstitutional impairment of those members existing

11   contractual relationship in violation of the Washington Contract Clause. Such

12   application will cause those members to suffer irreparable harm for which they

13   have no adequate remedy at law.

14   **<u>PRAYER FOR RELIEF</u>**

15       WHEREFORE, Plaintiffs pray for the following relief:

16       1.    On the first cause of action, a judgment declaring that the

17   Ordinance, as well as any act taken in furtherance of the Ordinance by any person,

18   is preempted by the National Labor Relations Act, and its implementing regulations

19   and guidance, and are therefore void and unenforceable, and entering a preliminary

20   and permanent injunction enjoining the City from enforcing or taking any action

21   under the Ordinance;

22       2.    On the second and third causes of action, enter a judgment declaring

23   that the Ordinance, as well as any act taken in furtherance of the Ordinance by any

24   person, violate state and federal equal protection guarantees, and are therefore void

25   and invalid, and entering a preliminary and permanent injunction enjoining the City

26   from enforcing or taking any action under the Ordinance;

27       3.    On the fourth and fifth causes of action, enter a judgment declaring

28   that the Ordinance, as well as any act taken in furtherance of the Ordinance by any

person, violate the contracts clauses of the state and federal constitution, and are therefore void and invalid, and entering a preliminary and permanent injunction enjoining the City from enforcing or taking any action under the Ordinance;

4.    For an award of attorneys' fees and costs of suit herein pursuant to 42 U.S.C. §1988, or any other applicable law; and

5.    For such other and further relief as the Court may deem just and proper.

DATED:  February 3, 2021

STOEL RIVES LLP

/s/ Adam S. Belzberg
Adam S. Belzberg, WSBA No. 41022
/s/ Vanessa Soriano Power
Vanessa Soriano Power, WSBA No. 30777
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Email:  adam.belzberg@stoel.com
            vanessa.power@stoel.com

William F. Tarantino (Pro Hac Vice Pending)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone: (415) 268-7000
Email: wtarantino@mofo.com

Tritia M. Murata (Pro Hac Vice Pending)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017-3543
Telephone: (213) 892-5200
Email: tmurata@mofo.com

Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# Exhibit A



# SEATTLE CITY COUNCIL

600 Fourth Ave. 2nd Floor
Seattle, WA 98104

## Legislation Text

**File #:** CB 119990, **Version:** 2

## CITY OF SEATTLE

## ORDINANCE _____

COUNCIL BILL _____

AN ORDINANCE relating to employment in Seattle; establishing labor standards requirements for additional
compensation for grocery employees working in Seattle; amending Sections 3.02.125 and 6.208.020 of
the Seattle Municipal Code; declaring an emergency; and establishing an immediate effective date; all
by a 3/4 vote of the City Council.

WHEREAS, the new coronavirus 19 (COVID-19) disease is caused by a virus that spreads easily from person

to person and may result in serious illness or death, and is classified by the World Health Organization

as a worldwide pandemic; and

WHEREAS, COVID-19 has broadly spread throughout Washington State and remains a significant health risk

to the community, especially members of our most vulnerable populations; and

WHEREAS, the Brookings Metropolitan Policy Program has reported that the United States' top retail

companies, including grocery businesses, have earned record-breaking profits during the pandemic; and

WHEREAS, grocery employees have been supporting grocery businesses' operations and facilitating

community access to food during the pandemic, despite facing a clear and present danger of workplace

exposure to COVID-19 and receiving limited or inconsistent additional pay in recognition of this

hazard; and

WHEREAS, the dangers of working during the pandemic are especially significant for Black, Indigenous, and

People of Color (BIPOC) employees who are overrepresented among the retail frontline workforce and

who are disproportionately impacted by COVID-19; and

WHEREAS, establishing a requirement for grocery employees to receive hazard pay for work performed in

SEATTLE CITY COUNCIL
Page 1 of 35
Printed on 2/3/2021
powered by Legistar™

**Exhibit A**
**Page 1 of 35**

File #: CB 119990, **Version**: 2

Seattle during the COVID-19 emergency will promote job retention, compensate them for the risks of working on the frontlines of a global pandemic, improve their financial ability to access resources for protecting themselves and their families from catching or spreading the virus or coping with illness caused by the virus, and support the welfare of the greater community that depends on grocery employees for safe and reliable access to food; and

WHEREAS, the City Council (Council) intends to consider modifying or eliminating hazard pay requirements after four or months of implementation and review of the current health, safety, and economic risks of frontline work during the COVID-19 emergency; and

WHEREAS, the City encourages employers of essential frontline workers to help facilitate the distribution of COVID-19 vaccines to their employees as vaccines become available; and

WHEREAS, on June 15, 2020, the City Council (Council) passed emergency legislation, Ordinance 126094 (Premium Pay for Gig Workers Ordinance), requiring food delivery network companies to provide gig workers with premium pay, which is a form of hazard pay, to compensate them for the hazards of working during the COVID-19 emergency; and

WHEREAS, the Premium Pay for Gig Workers Ordinance went into effect upon the Mayor's signature on June 26, 2020; and

WHEREAS, recognizing the ongoing threat to frontline grocery employees, several California cities, including Berkeley, Long Beach, Los Angeles, and San Francisco, as well as Los Angeles County, have announced legislative efforts to require hazard pay of $4 to $5 per hour for grocery employees during the COVID-19 emergency, and more cities are expected to announce similar legislation in 2021; and

WHEREAS, the City is a leader on wage, labor, and workforce practices that improve workers' lives, support economic security, and contribute to a fair, healthy, and vibrant economy; and

WHEREAS, establishing a labor standard that requires hazard pay for grocery employees is a subject of vital and imminent concern to the community and requires appropriate action by the City Council; NOW,

THEREFORE,

**BE IT ORDAINED BY THE CITY OF SEATTLE AS FOLLOWS:**

Section 1. The City Council (Council) finds and declares that:

A. In the exercise of The City of Seattle's police powers, the City is granted authority to pass regulations designed to protect and promote public health, safety, and welfare.

B. This ordinance protects and promotes public health, safety, and welfare during the new coronavirus 19 (COVID-19) emergency by requiring grocery businesses to provide hazard pay for grocery employees performing work in Seattle, thereby increasing retention of employees who provide essential services on the frontlines of a global pandemic and paying additional compensation to those employees for the hazards of working with significant exposure to an infectious disease.

C. On January 30, 2020, the World Health Organization (WHO) declared that COVID-19 constituted a public health emergency of international concern, WHO's highest level of alarm.

D. On February 29, 2020, Washington Governor Jay Inslee issued proclamation 20-05, proclaiming a state of emergency for all counties throughout the state of Washington in response to new cases of COVID-19, and directing state agencies to use all resources necessary to prepare for and respond to the outbreak.

E. On March 3, 2020, Mayor Jenny Durkan proclaimed a civil emergency in response to new cases of COVID-19, authorizing the Mayor to exercise the emergency powers necessary to take extraordinary measures to prevent death or injury of persons and to protect the public peace, safety and welfare, and alleviate damage, loss, hardship or suffering.

F. On March 23, 2020, Washington Governor Jay Inslee issued Proclamation 20-25, a "Stay Home - Stay Healthy" order closing all non-essential workplaces, requiring people to stay home except to participate in essential activities or to provide essential business services, and banning all gatherings for social, spiritual, and recreational purposes. This order was extended through May 31, 2020. The "Stay Home - Stay Healthy" proclamation identified grocery employees as "Essential Critical Infrastructure Workers" performing work to

**Exhibit A**
**Page 3 of 35**

**File #:** CB 119990, **Version:** 2

protect communities and ensure continuity of functions critical to public health and safety, as well as economic and national security.

G. On May 4, 2020, Washington Governor Jay Inslee announced a "Safe Start" plan to start on June 1, 2020 to reopen Washington's economy in phases with adequate social distancing measures and health standards in place.

H. On June 19, 2020, Washington State Secretary of Health John Wiesman approved King County to move to Phase 2 of the "Safe Start" plan.

I. On June 26, 2020, Seattle Ordinance 126094 (Premium Pay for Gig Workers Ordinance), went into effect for gig workers working in Seattle for food delivery network companies during the COVID-19 emergency. This emergency legislation requires food delivery network companies to provide gig workers with additional compensation, "premium pay," for each online order that results in the gig worker making a work-related stop in Seattle. The premium pay, which is a form of hazard pay, compensates gig workers for the risks of working for food delivery network companies during the COVID-19 emergency and for the costs of taking preventative safety measures to protect themselves and others from spreading the virus.

J. In October 2020, The British Medical Journal, *Occupational & Environmental Medicine*, reported that grocery employees face a serious risk of COVID-19 infection and associated psychological distress. A study of 104 grocery employees at a grocery store in Boston, Massachusetts found that 20 percent tested positive for COVID-19 despite 91 percent of employees reporting wearing a face mask at work and 77 percent of employees reporting wearing masks outside of work. The positive rate of infection among grocery employees was five times as likely for those who interacted with customers than for those who did not. Additionally, the study found that 76 percent of employees had no symptoms, suggesting that these employees could be an important reservoir of asymptomatic infection. Further, 24 of the 99 employees who filled out a related medical health questionnaire also reported experiencing anxiety, and eight employees were deemed depressed from their questionnaire answers.

**Exhibit A**
**Page 4 of 35**

**File #:** CB 119990, **Version:** 2

K. In November 2020, the Brookings Metropolitan Policy Program reported that the profits of top retail companies, including grocery businesses, soared during the pandemic while their employees earned low wages and, with few exceptions, failed to receive consistent or meaningful additional compensation for performing life threatening work. The report found that the top retail companies in their analysis earned on average an extra $16.7 billion in profit compared to the previous year - a 40 percent increase. Frontline retail employees experienced little of this windfall, averaging a 10 percent pay increase on top of wages that were often too low to meet a family's basic needs.

L. On January 3, 2021, the Center for Disease Control (CDC) reported that multiple COVID-19 variants are circulating globally that appear to spread more easily and quickly than other variations.

M. Studies show that a variant first detected in the United Kingdom (UK) in September 2020, known as B.1.1.7,  is 50 to 70 percent more transmissible than the previously circulating form of the COVID-19 virus and is responsible for more than half of new infections in the UK. The B.1.1.7 variant is now prevalent in 40 countries, and cases in the United States have been identified in nine states: California, Colorado, Connecticut, Georgia, Florida, Minnesota, New York, Pennsylvania, and Texas.

N. Studies show that a highly contagious COVID-19 variant first detected in South Africa may pose a risk to COVID antibody treatments.

O. The Washington State Department of Health (DOH) reports that two vaccines are authorized for emergency use by United States Food & Drug Administration. In December 2020, the DOH published a COVID-19 vaccine estimated timeline beginning in December 2020 with a "Phase 1a" for high-risk health care workers in healthcare settings, high-risk first responders, long term care facility residents, and continuing for other identified high-risk individuals through April 2021. The timeline stated that future phases would be announced for May through December 2021.

P. Initially, DOH's COVID vaccine timeline indicated that all grocery employees would be eligible for

**File #:** CB 119990, **Version:** 2

vaccination in February 2021. A modified timeline, published in January 2021, clarified that only grocery employees 50 years or older would be eligible in February 2021 and grocery employees under 50 years would be eligible in April 2021.

Q. Across the country, states have widely varied in their administration of the vaccine and logistical problems have put efforts to vaccinate the country behind schedule.

R. As of January 11, 2021, the CDC reported that about nine million people received the first dose of the COVID vaccine, far short of the federal goal of administering the first dose for at least 20 million people by the end of 2020. In Washington state, the DOH reported that only one third of the 624,975 vaccine doses distributed to the state had been administered by this same date. Some of the gap for Washington state may be attributable to data lags and logistical issues in the federal partnership with clinics administering the vaccine.

S. On January 5, 2021, Governor Jay Inslee announced the "Healthy Washington-Roadmap to Recovery," a COVID-19 phased recovery plan beginning on January 11, 2021 that starts with every region in Phase 1, prohibiting indoor gatherings with people outside the household and limiting business activity. Regions may reopen when they meet certain metrics around hospitalization and case data.

T. Dr. Jeff Duchin, Health Officer for Public Health - Seattle & King County, has stated that the target for COVID-19 activity is a downward trend of fewer than ten new cases for every 100,000 residents over a two-week period, which translates to about 16 cases or fewer per day over 14 days.

U. On January 13, 2020, Public Health - Seattle & King County reported that the current status in King County is 352 positive cases per 100,000 residents.

V. As of January 13, 2021, Public Health - Seattle & King County reported a total of 70,094 positive cases including 1,151 deaths. The Washington DOH reported a total of 281,202 positive cases including 3,838 deaths and the WHO reported a total of 90,759,370 cases including 1,963,169 deaths.

W. Throughout the entirety of the COVID-19 emergency, grocery businesses have been operating in Seattle and relying upon the work of grocery employees who are highly vulnerable to health and safety risks.

SEATTLE CITY COUNCIL                    Page 6 of 35                    Printed on 2/3/2021
**Exhibit A**
**Page 6 of 35**                                              powered by Legistar™

File #: CB 119990, **Version:** 2

X. Grocery employees are essential workers performing services that are fundamental to the economy and health of the community during the COVID-19 crisis. They face clear and present dangers at their jobs and continue to risk their lives and the health of their families to keep the community's food supply chain operating.

Y. Grocery employees cannot choose to work from home and must come to work to perform their jobs, which can involve substantial interaction with customers and/or ventilation systems that could potentially spread the virus. They are wearing masks, trying as much as possible to social distance, performing safety protocols, and learning new skills to decrease transmission of the virus to protect themselves and the public.

Z. The risks of working during the pandemic are especially significant for BIPOC employees because they are overrepresented among the retail frontline workforce and are disproportionately impacted by COVID-19. Data shows that people of color are disproportionately experiencing hospitalization and dying of COVID-19.

AA. The CDC reports that Black and Indigenous people, followed by Pacific Islanders and Latinx people, are disproportionately affected by COVID-19 due to long-standing inequities in social determinants of health, including overrepresentation in jobs that require customer contact such as grocery stores; lower incomes and barriers to wealth accumulation; lack of access to quality healthcare and fair treatment in the healthcare system; difficulties in finding affordable and quality housing; and inequities in access to high-quality education. The CDC reports that these determinants may increase risk of COVID-19 exposure, illness, hospitalization, long-term health and social consequences, and death. To stop the spread of COVID-19, the CDC states that resources must be equitably available for everyone to maintain physical and mental health.

BB. Science in the News (SITN), a graduate student group at the Harvard Graduate School of the Arts and Sciences, reports that it is more difficult for BIPOC communities to stay safe during the pandemic and notes the importance of keeping these vulnerable populations in mind as the country slowly reopens the economy. SITN states that social distancing is a privilege that many people of color cannot afford because they work and reside in situations with higher risk of exposure to the virus: people of color are more likely to live in

densely populated areas; reside in multigenerational and multifamily households; and use public transportation. Furthermore, SITN reports that many inequalities that pre-dated the pandemic have worsened, including limited access for Black and Latinx communities to primary care physicians, medical facilities, and COVID testing.

CC. Grocery businesses are profiting during the pandemic from the labor of employees who are working under dangerous conditions.

DD. Hazard pay, paid in addition to regular wages, is an established type of additional compensation for employees performing hazardous duties or work involving physical hardship that can cause extreme physical discomfort and distress.

EE. Grocery employees working during the COVID-19 emergency merit hazard pay because they are performing hazardous duty or work involving physical hardship that can cause extreme physical discomfort and distress due to the significant risk of exposure to the COVID-19 virus.

FF. Grocery employees have been working under hazardous conditions month after month. They are working in these hazardous conditions now and will continue to face safety risks as the virus presents an ongoing threat, including the threat of more contagious variants, for an uncertain period. In the best-case scenario, grocery employees can expect to be vaccinated from the virus within four months. However, state and national delays in vaccination efforts suggest the potential for a longer timeline. In the meantime, the crisis of the pandemic continues unabated and presents extreme risks for grocery employees.

GG. Ensuring that grocery employees are compensated for the substantial risks of working during the COVID-19 emergency promotes retention of these vital workers. Retention of grocery employees is fundamental to protecting the health of the community as these employees directly support public purchase of groceries and facilitate community access to food.

HH. This ordinance is immediately necessary in response to the COVID-19 emergency because the health threats that grocery employees face are as significant now as when this crisis began and are growing exponentially as community transmission is already surging, COVID-19 variants may further increase

File #: CB 119990, **Version:** 2

transmission of the virus and reduce therapeutic treatments, and vaccinations are destined for a gradual roll-out that could take four months or more for grocery employees and much longer for the general public. This is a rapidly evolving situation, with disproportionate risks and adverse impacts for BIPOC communities, that must be addressed without delay.

II. Grocery employees are necessary to protect the public health because their work sustains access to groceries; hazard pay is one step to recognize the dangers facing these employees as they support our community, encourage them to continue their vital work, and provide them with additional financial resources.

JJ. An immediate requirement to provide grocery employees with hazard pay promotes retention of essential workers, improves the financial ability of grocery employees to access resources they need to stay safe and healthy, and ultimately supports the greater community that depends on grocery employees for consistent, safe and reliable access to food.

Section 2. As the substantive effects of this ordinance are not permanent, this ordinance is not intended to be codified. Section numbers are for ease of reference within this ordinance, and section and subsection references refer to numbers in this ordinance unless stated otherwise.

**HAZARD PAY FOR GROCERY EMPLOYEES**

**100.005 Short title**

This ordinance shall constitute the "Hazard Pay for Grocery Employees Ordinance" and may be cited as such.

**100.010 Definitions**

For purposes of this ordinance:

"Adverse action" means reducing compensation, garnishing gratuities, denying a job or promotion, demoting, terminating, failing to rehire after a seasonal interruption of work, threatening, penalizing, retaliating, engaging in unfair immigration-related practices, filing a false report with a government agency, or otherwise discriminating against any person for any reason prohibited by Section 100.050. "Adverse action" for an employee may involve any aspect of employment, including compensation, work hours, responsibilities, or

SEATTLE CITY COUNCIL                     Page 9 of 35                     Printed on 2/3/2021
                                                                        powered by Legistar™
**Exhibit A**
**Page 9 of 35**

other material change in the terms and conditions of employment. "Adverse action" also encompasses any action by the employer or a person acting on the employer's behalf that would dissuade a reasonable person from exercising any right afforded by this ordinance.

"Agency" means the Office of Labor Standards and any division therein.

"Aggrieved party" means an employee or other person who suffers tangible or intangible harm due to an employer or other person's violation of this ordinance.

"City" means The City of Seattle.

"Compensation" means the payment owed to an employee by reason of employment, including but not limited to, salaries, wages, tips, service charge distributions, overtime, commissions, piece rate, bonuses, rest breaks, promised or legislatively required pay or paid leave, and reimbursement for employer expenses.

"Director" means the Director of the Office of Labor Standards or the Director's designee.

"Director rules" means: (1) rules the Director or Agency may promulgate pursuant to subsection 100.060.B or 100.060.C; or (2) other rules that the Director identifies, by means of an Agency Q&A, previously promulgated pursuant to authority in Seattle Municipal Code Title 14. Rules the Director identifies by means of an Agency Q&A shall have the force and effect of law and may be relied on by employers, employees, and other parties to determine their rights and responsibilities under this ordinance.

"Employ" means to suffer or permit to work;

"Employee" means "employee" as defined under Seattle Municipal Code Section 12A.28.200, including but not limited to full-time employees, part-time employees, and temporary workers.  An alleged employer bears the burden of proof that the individual is, as a matter of economic reality, in business for oneself (i.e., an independent contractor) rather than dependent upon the alleged employer.

 "Employer" means any individual, partnership, association, corporation, business trust, or any entity, person or group of persons, or a successor thereof, that employs another person and includes any such entity or person acting directly or indirectly in the interest of the employer in relation to the employee. More than one

**Exhibit A**
**Page 10 of 35**

File #: CB 119990, **Version:** 2

entity may be the "employer" if employment by one employer is not completely disassociated from employment by any other employer.

"Franchise" means an agreement by which:

1. A person is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by the grantor or its affiliate;

2. The operation of the business is substantially associated with a trademark, service mark, trade name, advertising, or other commercial symbol; designated, owned by, or licensed by the grantor or its affiliate; and

3. The person pays, agrees to pay, or is required to pay, directly or indirectly, a franchise fee.

"Franchisee" means a person to whom a franchise is offered or granted.

"Franchisor" means a person who grants a franchise to another person.

"Front pay" means the compensation the employee would earn or would have earned if reinstated to the employee's former position.

"Grocery business" means a retail store operating in Seattle that is either:

1. Over 10,000 square feet in size and that is primarily engaged in retailing groceries for offsite consumption, including but not limited to the sale of fresh produce, meats, poultry, fish, deli products, dairy products, canned and frozen foods, dry foods, beverages, baked foods, and/or prepared foods. Other household supplies or other products shall be secondary to the primary purpose of groceries sales; or

2. Over 85,000 square feet and with 30 percent or more of its sales floor area dedicated to sale of groceries, including but not limited to the sale of fresh produce, meats, poultry, fish, deli products, dairy products, canned and frozen foods, dry foods, beverages, baked foods, and/or prepared foods.

"Grocery business" does not include convenience stores or food marts primarily engaged in retailing a limited line of goods that generally includes milk, bread, soda, and snacks. "Grocery business" also does not

include farmers' markets as defined by the City's Multi-Departmental Administrative Rule 09-01 for the Farmers Markets Pilot Program or its successor rule.

"Grocery employee" means an employee covered by this ordinance.

"Hazard pay" means additional compensation owed to an employee on top of the employee's other compensation, including but not limited to salaries, wages, tips, service charge distributions, overtime, commissions, piece rate, bonuses, rest breaks, promised or legislatively required pay or paid leave, and reimbursement for employer expenses. For the purposes of compensating an employee for paid sick and paid safe time under Seattle Municipal Code Chapter 14.16, hazard pay is considered a premium rate and is not included in the employee's normal hourly compensation.

"Primary language" means the language in which the employee feels most comfortable communicating.

"Rate of inflation" means 100 percent of the annual average growth rate of the bi-monthly Seattle-Tacoma-Bellevue Area Consumer Price Index for Urban Wage Earners and Clerical Workers, termed CPI-W, for the 12-month period ending in August, provided that the percentage increase shall not be less than zero.

"Respondent" means an employer or any person who is alleged or found to have committed a violation of this ordinance.

"Successor" means any person to whom an employer quitting, selling out, exchanging, or disposing of a business sells or otherwise conveys in bulk and not in the ordinary course of the employer's business, a major part of the property, whether real or personal, tangible or intangible, of the employer's business. For purposes of this definition, "person" means an individual, receiver, administrator, executor, assignee, trustee in bankruptcy, trust, estate, firm, corporation, business trust, partnership, limited liability partnership, company, joint stock company, limited liability company, association, joint venture, or any other legal or commercial entity.

"Tips" means a verifiable sum to be presented by a customer as a gift or gratuity in recognition of some service performed for the customer by the employee receiving the tip.

File #: CB 119990, **Version:** 2

"Written" or "writing" means a printed or printable communication in physical or electronic format, including but not limited to a communication that is transmitted through email, text message, or a computer or mobile system, or that is otherwise sent and maintained electronically.

**100.015 Employee coverage**

For the purposes of this ordinance:

A. Covered employees are limited to those who perform work for a covered employer at a retail location in Seattle.

B. Time spent by an employee in Seattle solely for the purpose of travelling through Seattle from a point of origin outside Seattle to a destination outside Seattle, with no employment-related or commercial stops in Seattle except for refueling or the employee's personal meals or errands, is not covered by this ordinance.

C. Employees who are gig workers under Ordinance 126094 are not covered employees under this ordinance. Employers must pay all compensation owed to such gig workers in accordance with their obligations under Ordinance 126094.

**100.020 Employer coverage**

A. For the purposes of this ordinance, covered employers are limited to grocery businesses that employ 500 or more employees worldwide regardless of where those employees are employed, including but not limited to chains, integrated enterprises, or franchises associated with a franchisor or network of franchises that employ 500 or more employees in aggregate.

B. To determine the number of employees for the current calendar year:

1. The calculation is based upon the average number per calendar week of employees who worked for compensation during the preceding calendar year for any and all weeks during which at least one employee worked for compensation. For employers that did not have any employees during the preceding calendar year, the number of employees(s) for the current calendar year is calculated based upon the average number per calendar week of employees who worked for compensation during the first 90 calendar days of the

current year in which the employer engaged in business.

    2. All employees who worked for compensation shall be counted, including but not limited to:

        a. Employees who are not covered by this ordinance;

        b. Employees who worked in Seattle;

        c. Employees who worked outside Seattle; and

        d. Employees who worked in full-time employment, part-time employment, joint employment, temporary employment, or through the services of a temporary services or staffing agency or similar entity.

C. Separate entities that form an integrated enterprise shall be considered a single employer under this ordinance. Separate entities will be considered an integrated enterprise and a single employer under this ordinance where a separate entity controls the operation of another entity. The factors to consider in making this assessment may include, but are not limited to:

    1. Degree of interrelation between the operations of multiple entities;

    2. Degree to which the entities share common management;

    3. Centralized control of labor relations;

    4. Degree of common ownership or financial control over the entities; and

    5. Use of a common brand, trade, business, or operating name.

D. The Agency is authorized to make a reasonable inference as to whether an employer meets the definition of "grocery business" under Section 100.010, and an alleged employer bears the burden of proof to show that the employer is not a "grocery business" as defined in Section 100.010.

E. When determining whether an employer is "primarily engaged in retailing groceries" according to the definition of "grocery business" under Section 100.010, the Agency may consider any number of factors, including but not limited to the following examples: grocery sales as a percentage of the retail store's overall sales; sales floor area dedicated to grocery sales; marketing or promotional materials from the employer; or

**Exhibit A**
**Page 14 of 35**

powered by Legistar™

other public statements from representatives of the employer.

**100.025 Hazard pay requirements**

A. Employers shall provide each employee with hazard pay at a rate of four dollars per hour for each hour worked in Seattle.

1. No employer shall, as a result of this ordinance going into effect, take steps to reduce employee compensation so as to prevent, in whole or in part, employees from receiving hazard pay at a rate of four dollars per hour for each hour worked in Seattle in addition to those employees' other compensation. Employers shall maintain records to establish the reason(s) for any reduction in employee compensation pursuant to Section 100.040.

2. Employers providing hazard pay, as defined under Section 100.010, on the effective date of this ordinance may use the hourly rate of that hazard pay to offset the amount due under this subsection 100.025.A.

a. Employers shall comply with requirements for providing compensation in Section 100.025.B for the entire amount due under Section 100.025.A.

b. Employers bear the burden the proof to show that the additional compensation is hazard pay for the purposes of working during the COVID-19 emergency.

B. Employers shall comply with the requirements for providing compensation in the Wage Theft Ordinance, Seattle Municipal Code Chapter 14.20, including but not limited to the following:

1. Employers shall provide revised written notice of employment information that includes notice of hazard pay pursuant to Seattle Municipal Code subsection 14.20.025.D, provided that such notice is due by 30 days after the effective date of this ordinance. The revised notice of employment information shall include notice of any hazard pay offset available under subsection 100.025.A.2.

2. Employers shall provide payment for hazard pay on the established, regular pay day on which wages are paid pursuant to Seattle Municipal Code Section 14.20.020.

3. Employers shall provide written itemization of the hazard pay separately from payment for wages and other compensation pursuant to Seattle Municipal Code subsection 14.20.025.E.

C.  Employers shall comply with the hazard pay requirements in this Section 100.025 for the duration of the civil emergency proclaimed by the Mayor on March 3, 2020.

**100.030 Notice and posting**

A. Within 30 days of the effective date of this ordinance, employers shall display a written notice of rights established by this ordinance in a conspicuous and accessible place at any workplace or job site where any of their employees' work. Employers shall display the notice of rights in English and in the primary language(s) of the employee(s) at the workplace or job site. Employers shall make a good faith effort to determine the primary languages of the employees at the workplace or job site. If display of the notice of rights is not feasible, including situations when the employee works remotely or does not have a regular workplace or job site, employers may solely provide the notice of rights on an individual basis in the employee's primary language in a physical or electronic format that is reasonably conspicuous and accessible.

B. The notice of rights shall provide information on:

1. The right to hazard pay guaranteed by this ordinance;

2. The right to be protected from retaliation for exercising in good faith the rights protected by this ordinance; and

3. The right to file a complaint with the Agency or bring a civil action for a violation of the requirements of this ordinance, including an employer's denial of hazard pay as required by this ordinance and an employer or other person's retaliation against an employee or other person for asserting the right to hazard pay or otherwise engaging in an activity protected by this ordinance.

C. The Agency may create and distribute a model notice of rights in English and other languages. However, employers are responsible for providing employees with the notice of rights required by subsection 100.030.A and 100.030.B in a form and manner sufficient to inform employees of their rights under this

**Exhibit A**
**Page 16 of 35**

File #: CB 119990, **Version:** 2

ordinance, regardless of whether the Agency has created and distributed a model notice of rights.

**100.040 Employer records**

    A. Employers shall retain records that document compliance with this ordinance for each employee.

    B. Employers shall retain the records required by subsection 100.040.A for a period of three years.

    C. If an employer fails to retain adequate records required under subsection 100.040.A, there shall be a presumption, rebuttable by clear and convincing evidence, that the employer violated this ordinance for the periods and for each employee for whom records were not retained.

**100.050 Retaliation prohibited**

    A. No employer or any other person shall interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right protected under this ordinance.

    B. No employer or any other person shall take any adverse action against any person because the person has exercised in good faith the rights protected under this ordinance. Such rights include, but are not limited to, the right to make inquiries about the rights protected under this ordinance; the right to inform others about their rights under this ordinance; the right to inform the person's employer, the person's legal counsel, a union or similar organization, or any other person about an alleged violation of this ordinance; the right to file an oral or written complaint with the Agency or bring a civil action for an alleged violation of this ordinance; the right to cooperate with the Agency in its investigations of this ordinance; the right to testify in a proceeding under or related to this ordinance; the right to refuse to participate in an activity that would result in a violation of city, state or federal law; and the right to oppose any policy, practice, or act that is unlawful under this ordinance.

    C. No employer or any other person shall communicate to a person exercising rights protected in this Section 100.050, directly or indirectly, the willingness to inform a government worker that the person is not lawfully in the United States, or to report, or to make an implied or express assertion of a willingness to report, suspected citizenship or immigration status of an employee or family member of an employee to a federal, state, or local agency because the employee has exercised a right under this ordinance.

File #: CB 119990, **Version:** 2

D. It shall be a rebuttable presumption of retaliation if an employer or any other person takes an adverse action against a person within 90 days of the person's exercise of rights protected in this Section 100.050. However, in the case of seasonal work that ended before the close of the 90-day period, the presumption also applies if the employer fails to rehire a former employee at the next opportunity for work in the same position. The employer may rebut the presumption with clear and convincing evidence that the adverse action was taken for a permissible purpose.

E. Proof of retaliation under this Section 100.050 shall be sufficient upon a showing that an employer or any other person has taken an adverse action against a person and the person's exercise of rights protected in this Section 100.050 was a motivating factor in the adverse action, unless the employer can prove that the action would have been taken in the absence of such protected activity.

F. The protections afforded under this Section 100.050 shall apply to any person who mistakenly but in good faith alleges violations of this ordinance.

G. A complaint or other communication by any person triggers the protections of this Section 100.050 regardless of whether the complaint or communication is in writing or makes explicit reference to this ordinance.

**100.060 Enforcement power and duties**

A. The Agency shall have the power to investigate violations of this ordinance and shall have such powers and duties in the performance of these functions as are defined in this ordinance and otherwise necessary and proper in the performance of the same and provided for by law.

B. The Agency is authorized to coordinate implementation and enforcement of this ordinance and may promulgate appropriate guidelines or rules for such purposes.

C. The Director is authorized to promulgate rules consistent with this ordinance and Chapter 3.02 of the Seattle Municipal Code. Any guidelines or rules promulgated by the Director shall have the force and effect of law and may be relied on by employers, employees, and other parties to determine their rights and

responsibilities under this ordinance.

**100.070 Violation**

The failure of any respondent to comply with any requirement imposed on the respondent under this ordinance is a violation.

**100.080 Investigation**

A. The Agency shall have the power to investigate any violations of this ordinance by any respondent. The Agency may initiate an investigation pursuant to Director rules, including but not limited to situations when the Director has reason to believe that a violation has occurred or will occur, or when circumstances show that violations are likely to occur within a class of employers or businesses because the workforce contains significant numbers of employees who are vulnerable to violations of this ordinance or the workforce is unlikely to volunteer information regarding such violations. An investigation may also be initiated through the receipt by the Agency of a report or complaint filed by an employee or other person.

B. An employee or other person may report to the Agency any suspected violation of this ordinance. The Agency shall encourage reporting pursuant to this Section 100.080 by taking the following measures:

1. The Agency shall keep confidential, to the maximum extent permitted by applicable laws, the name and other identifying information of the employee or person reporting the violation. However, with the authorization of such person, the Agency may disclose the employee's or person's name and identifying information as necessary to enforce this ordinance or for other appropriate purposes.

2. Employers shall provide employees with written notice of an investigation. Employers shall provide the notice in a format that is readily accessible to employees. The Agency shall create the notice in English and other languages.

3. The Agency may certify the eligibility of eligible persons for "U" Visas under the provisions of 8 U.S.C. § 1184.p and 8 U.S.C. § 1101.a.15.U. This certification is subject to applicable federal law and regulations, and Director rules.

C. The Agency's investigation shall commence within three years of the alleged violation. To the extent permitted by law, the applicable statute of limitations for civil actions is tolled during any investigation under this ordinance and any administrative enforcement proceeding under this ordinance based upon the same facts. For purposes of this ordinance:

　　　1. The Agency's investigation begins on the earlier date of when the Agency receives a complaint from a person under this ordinance, or when the Agency provides notice to the respondent that an investigation has commenced under this ordinance.

　　　2. The Agency's investigation ends when the Agency issues a final order concluding the matter and any appeals have been exhausted; the time to file any appeal has expired; or the Agency notifies the respondent in writing that the investigation has been otherwise resolved.

D. The Agency's investigation shall be conducted in an objective and impartial manner.

E. The Director may apply by affidavit or declaration in the form allowed under RCW 9A.72.085 to the Hearing Examiner for the issuance of subpoenas requiring a hiring entity to produce the records required by Section 100.040, or for the attendance and testimony of witnesses, or for the production of documents required to be retained under Section 100.040, or any other document relevant to the issue of whether any employee or group of employees has been or is afforded the proper amount of hazard pay required by this ordinance and/or to whether an employer has violated any provision of this ordinance. The Hearing Examiner shall conduct the review without hearing as soon as practicable and shall issue subpoenas upon a showing that there is reason to believe that: a violation has occurred, a complaint has been filed with the Agency, that circumstances show that violations are likely to occur within a class of businesses because the workforce contains significant numbers of employees who are vulnerable to violations of this ordinance, the workforce is unlikely to volunteer information regarding such violations, or the Agency has gathered preliminary information indicating that a violation may have occurred.

F. An employer that fails to comply with the terms of any subpoena issued under subsection 100.080.E

SEATTLE CITY COUNCIL　　　　　Page 20 of 35　　　　　Printed on 2/3/2021
powered by Legistar™
**Exhibit A**
**Page 20 of 35**

in an investigation by the Agency under this ordinance before the issuance of a Director's Order issued pursuant to subsection 100.090.C may not use such records in any appeal to challenge the correctness of any determination by the Agency of liability, damages owed, or penalties assessed.

G. In addition to other remedies, the Director may refer any subpoena issued under subsection 100.080.E to the City Attorney to seek a court order to enforce any subpoena.

H. Where the Director has reason to believe that a violation has occurred, the Director may order any appropriate temporary or interim relief to mitigate the violation or maintain the status quo pending completion of a full investigation or hearing, including but not limited to a deposit of funds or bond sufficient to satisfy a good-faith estimate of compensation, interest, damages, and penalties due. A respondent may appeal any such order in accordance with Section 100.210.

## 100.090 Findings of fact and determination

A. Except when there is an agreed upon settlement, the Director shall issue a written determination with findings of fact resulting from the investigation and statement of whether a violation of this ordinance has or has not occurred based on a preponderance of the evidence before the Director.

B. If the Director determines that there is no violation of this ordinance, the Director shall issue a "Determination of No Violation" with notice of an employee or other person's right to appeal the decision, pursuant to Director rules.

C. If the Director determines that a violation of this ordinance has occurred, the Director shall issue a "Director's Order" that shall include a notice of violation identifying the violation or violations.

1. The Director's Order shall state with specificity the amounts due under this ordinance for each violation, including payment of unpaid compensation, liquidated damages, civil penalties, penalties payable to aggrieved parties, fines, and interest pursuant to Section 100.200.

2. The Director's Order may specify that civil penalties and fines due to the Agency can be mitigated for respondent's timely payment of remedy due to an aggrieved party pursuant to subsection

**Exhibit A**
**Page 21 of 35**

File #: CB 119990, **Version:** 2

100.200.A.4.

     3. The Director's Order may specify that civil penalties and fines are due to the aggrieved party rather than due to the Agency pursuant to subsection 100.200.E or 100.200.F.

     4. The Director's Order may direct the respondent to take such corrective action as is necessary to comply with the requirements of this ordinance, including but not limited to monitored compliance for a reasonable time period.

     5. The Director's Order shall include notice of the respondent's right to appeal the decision pursuant to Section 100.210.

## 100.200 Remedies

A. The payment of unpaid compensation, liquidated damages, civil penalties, penalties payable to aggrieved parties, fines, and interest provided under this ordinance is cumulative and is not intended to be exclusive of any other available remedies, penalties, fines, and procedures.

     1. The amounts of all civil penalties, penalties payable to aggrieved parties, and fines contained in this Section 100.200 shall be increased annually to reflect the rate of inflation and calculated to the nearest cent on January 1 of each year thereafter. The Agency shall determine the amounts and file a schedule of such amounts with the City Clerk.

     2. If a violation is ongoing when the Agency receives a complaint or opens an investigation, the Director may order payment of unpaid compensation plus interest that accrues after receipt of the complaint or after the investigation opens and before the date of the Director's Order.

     3. Interest shall accrue from the date the unpaid compensation was first due at 12 percent annum, or the maximum rate permitted under RCW 19.52.020.

     4. If there is a remedy due to an aggrieved party, the Director may waive part or all civil penalties and fines due to the Agency based on timely payment of the full remedy due to the aggrieved party.

     a. The Director may waive the total amount of civil penalties and fines due to the Agency

if the Director determines that the respondent paid the full remedy due to the aggrieved party within ten days of service of the Director's Order.

b. The Director may waive half the amount of civil penalties and fines due to the Agency if the Director determines that the respondent paid the full remedy due to the aggrieved party within 15 days of service of the Director's Order.

c. The Director shall not waive any amount of civil penalties and fines due to the Agency if the Director determines that the respondent has not paid the full remedy due to the aggrieved party after 15 days of service of the Director's Order.

5. When determining the amount of liquidated damages, civil penalties, penalties payable to aggrieved parties, and fines due under this Section 100.200 for a settlement agreement or Director's Order, including but not limited to the mitigation of civil penalties and fines due to the Agency for timely payment of remedy due to an aggrieved party under subsection 100.200.A.4, the Director may consider:

a.  The total amount of unpaid compensation, liquidated damages, penalties, fines, and interest due;

b. The nature and persistence of the violations;

c. The extent of the respondent's culpability;

d. The substantive or technical nature of the violations;

e. The size, revenue, and human resources capacity of the respondent;

f. The circumstances of each situation;

g.  The amount of penalties in similar situations; and

h. Other factors pursuant to Director rules.

B. A respondent found to be in violation of this ordinance shall be liable for full payment of unpaid compensation due plus interest in favor of the aggrieved party under the terms of this ordinance and other equitable relief. If the precise amount of unpaid compensation cannot be determined due to a respondent's

failure to produce records or if a respondent produces records in a manner or form which makes timely determination of the amount of unpaid compensation impracticable, the Director may designate a daily amount of $50 for unpaid compensation due to aggrieved party. For any violation of this ordinance, the Director may assess liquidated damages in an additional amount of up to twice the unpaid compensation.

C. A respondent found to be in violation of this ordinance for retaliation under Section 100.050 shall be subject to any appropriate relief at law or equity including, but not limited to reinstatement of the aggrieved party, front pay in lieu of reinstatement with full payment of unpaid compensation plus interest in favor of the aggrieved party under the terms of this ordinance, and liquidated damages in an additional amount of up to twice the unpaid compensation. The Director also shall order the imposition of a penalty payable to the aggrieved party of up to $5,565.10.

D. A respondent found to be in violation of hazard pay requirements under subsection 100.025.A shall be subject to all remedies available under this Section 100.200.

E. The Director is authorized to assess civil penalties and may specify that civil penalties are due to the aggrieved party rather than due to the Agency.

1. For a first violation of this ordinance, the Director may assess a civil penalty of up to $556.30 per aggrieved party.

2. For a second violation of this ordinance, the Director shall assess a civil penalty of up to $1,112.60 per aggrieved party, or an amount equal to ten percent of the total amount of unpaid compensation, whichever is greater.

3. For a third or any subsequent violation of this ordinance, the Director shall assess a civil penalty of up to $5,565.10 per aggrieved party, or an amount equal to ten percent of the total amount of unpaid compensation, whichever is greater.

4. For purposes of this Section 100.200, a violation is a second, third, or subsequent violation if the respondent has been a party to one, two, or more than two settlement agreements, respectively, stipulating

SEATTLE CITY COUNCIL                    Page 24 of 35                    Printed on 2/3/2021
powered by Legistar™
**Exhibit A**
**Page 24 of 35**

that a violation has occurred; and/or one, two, or more than two Director's Orders, respectively, have issued against the respondent in the ten years preceding the date of the violation; otherwise, it is a first violation.

F. The Director is authorized to assess fines and may specify that fines are due to the aggrieved party rather than due to the Agency. The Director is authorized to assess fines as follows:

| Violation | Fine |
|---|---|
| Failure to display written notice of rights under Section 100.030 | $556.30 |
| Failure to retain employer records for three years under subsections 100.040.A and 100.040.B | $556.30 per missing record |
| Failure to comply with prohibitions against retaliation for exercising rights protected under Section 100.050 | $1,112.60 per aggrieved party |
| Failure to provide notice of investigation to employees under subsection 100.080.B.2 | $556.30 |
| Failure to post or distribute public notice of failure to comply with final order under subsection 100.240.A.1 | $556.30 |

The maximum amount that may be imposed in fines in a one-year period for each type of violation listed above is $5,565.10 unless a fine for retaliation is issued, in which case the maximum amount is $22,259.36.

G. A respondent who willfully hinders, prevents, impedes, or interferes with the Director or Hearing Examiner in the performance of their duties under this ordinance shall be subject to a civil penalty of not less than $1,112.60 and not more than $5,565.10.

H. In addition to the unpaid compensation, penalties, fines, liquidated damages, and interest, the Agency may assess against the respondent in favor of the City the reasonable costs incurred in enforcing this ordinance, including but not limited to reasonable attorneys' fees.

I. A respondent that is the subject of a settlement agreement stipulating that a violation has occurred shall count for debarment, or a final order for which all appeal rights have been exhausted, shall not be permitted to bid, or have a bid considered, on any City contract until such amounts due under the final order have been paid in full to the Director. If the respondent is the subject of a final order two times or more within a five-year period, the employer shall not be allowed to bid on any City contract for two years. This subsection

100.200.I shall be construed to provide grounds for debarment separate from, and in addition to, those contained in Seattle Municipal Code Chapter 20.70 and shall not be governed by that chapter provided that nothing in this subsection 100.200.I shall be construed to limit the application of Seattle Municipal Code Chapter 20.70. The Director shall notify the Director of Finance and Administrative Services of all respondents subject to debarment under this subsection 100.080.I.

**100.210 Appeal period and failure to respond**

A. An employee or other person who claims an injury as a result of an alleged violation of this ordinance may appeal the Determination of No Violation, pursuant to Director rules.

B. A respondent may appeal the Director's Order, including all remedies issued pursuant to Section 100.200, by requesting a contested hearing before the Hearing Examiner in writing within 15 days of service of the Director's Order. If a respondent fails to appeal the Director's Order within 15 days of service, the Director's Order shall be final. If the last day of the appeal period so computed is a Saturday, Sunday, or federal or City holiday, the appeal period shall run until 5 p.m. on the next business day.

**100.220 Appeal procedure and failure to appear**

A. Contested hearings shall be conducted pursuant to the procedures for hearing contested cases contained in Section 3.02.090 of the Seattle Municipal Code and the rules adopted by the Hearing Examiner for hearing contested cases. The hearing shall be conducted de novo and the Director shall have the burden of proving by a preponderance of the evidence that the violation or violations occurred. Upon establishing such proof, the remedies and penalties imposed by the Director shall be upheld unless it is shown that the Director abused discretion. Failure to appear for a contested hearing shall result in an order being entered finding that the respondent committed the violation stated in the Director's Order. For good cause shown and upon terms the Hearing Examiner deems just, the Hearing Examiner may set aside an order entered upon a failure to appear.

B. In all contested cases, the Hearing Examiner shall enter an order affirming, modifying or reversing the Director's Order, consistent with Ordinance 126068.

**Exhibit A**
**Page 26 of 35**

## 100.230 Appeal from Hearing Examiner order

A. The respondent may obtain judicial review of the decision of the Hearing Examiner by applying for a Writ of Review in the King County Superior Court within 30 days from the date of the decision in accordance with the procedure set forth in chapter 7.16 RCW, other applicable law, and court rules.

B. The decision of the Hearing Examiner shall be final and conclusive unless review is sought in compliance with this Section 100.230.

## 100.240 Failure to comply with final order

A. If a respondent fails to comply within 30 days of service of any settlement agreement with the Agency, or with any final order issued by the Director or the Hearing Examiner for which all appeal rights have been exhausted, the Agency may pursue, but is not limited to, the following measures to secure compliance:

1. The Director may require the respondent to post or distribute public notice of the respondent's failure to comply in a form and manner determined by the Agency.

2. The Director may refer the matter to a collection agency. The cost to the City for the collection services will be assessed as costs, at the rate agreed to between the City and the collection agency, and added to the amounts due.

3. The Director may refer the matter to the City Attorney for the filing of a civil action in King County Superior Court, the Seattle Municipal Court, or any other court of competent jurisdiction to enforce such order or to collect amounts due. In the alternative, the Director may seek to enforce a Director's Order or a final order of the Hearing Examiner under Section 100.250.

4. The Director may request that the City's Department of Finance and Administrative Services deny, suspend, refuse to renew, or revoke any business license held or requested by the hiring entity or person until such time as the hiring entity complies with the remedy as defined in the settlement agreement or final order. The City's Department of Finance and Administrative Services shall have the authority to deny, refuse to

renew, or revoke any business license in accordance with this subsection 100.240.A.4.

B. No respondent that is the subject of a final order issued under this ordinance shall quit business, sell out, exchange, convey, or otherwise dispose of the respondent's business or stock of goods without first notifying the Agency and without first notifying the respondent's successor of the amounts owed under the final order at least three business days before such transaction. At the time the respondent quits business, or sells out, exchanges, or otherwise disposes of the respondent's business or stock of goods, the full amount of the remedy, as defined in a final order issued by the Director or the Hearing Examiner, shall become immediately due and payable. If the amount due under the final order is not paid by respondent within ten days from the date of such sale, exchange, conveyance, or disposal, the successor shall become liable for the payment of the amount due, provided that the successor has actual knowledge of the order and the amounts due or has prompt, reasonable, and effective means of accessing and verifying the fact and amount of the order and the amounts due. The successor shall withhold from the purchase price a sum sufficient to pay the amount of the full remedy. When the successor makes such payment, that payment shall be deemed a payment upon the purchase price in the amount paid, and if such payment is greater in amount than the purchase price the amount of the difference shall become a debt due such successor from the hiring entity.

## 100.250 Debt owed The City of Seattle

A. All monetary amounts due under the Director's Order shall be a debt owed to the City and may be collected in the same manner as any other debt in like amount, which remedy shall be in addition to all other existing remedies, provided that amounts collected by the City for unpaid compensation, liquidated damages, penalties payable to aggrieved parties, or front pay shall be held in trust by the City for the aggrieved party and, once collected by the City, shall be paid by the City to the aggrieved party.

B. If a respondent fails to appeal a Director's Order to the Hearing Examiner within the time period set forth in subsection 100.210.B, the Director's Order shall be final, and the Director may petition the Seattle

File #: CB 119990, **Version:** 2

Municipal Court, or any court of competent jurisdiction, to enforce the Director's Order by entering judgment in favor of the City finding that the respondent has failed to exhaust its administrative remedies and that all amounts and relief contained in the order are due. The Director's Order shall constitute prima facie evidence that a violation occurred and shall be admissible without further evidentiary foundation. Any certifications or declarations authorized under RCW 9A.72.085 containing evidence that the respondent has failed to comply with the order or any parts thereof, and is therefore in default, or that the respondent has failed to appeal the Director's Order to the Hearing Examiner within the time period set forth in subsection 100.210.B, and therefore has failed to exhaust the respondent's administrative remedies, shall also be admissible without further evidentiary foundation.

C. If a respondent fails to obtain judicial review of an order of the Hearing Examiner within the time period set forth in subsection 100.230.A, the order of the Hearing Examiner shall be final, and the Director may petition the Seattle Municipal Court to enforce the Director's Order by entering judgment in favor of the City for all amounts and relief due under the order of the Hearing Examiner. The order of the Hearing Examiner shall constitute conclusive evidence that the violations contained therein occurred and shall be admissible without further evidentiary foundation. Any certifications or declarations authorized under RCW 9A.72.085 containing evidence that the respondent has failed to comply with the order or any parts thereof, and is therefore in default, or that the respondent has failed to avail itself of judicial review in accordance with subsection 100.230.A, shall also be admissible without further evidentiary foundation.

D. In considering matters brought under subsections 100.250.B and 100.250.C, the Municipal Court may include within its judgment all terms, conditions, and remedies contained in the Director's Order or the order of the Hearing Examiner, whichever is applicable, that are consistent with the provisions of this ordinance.

**100.260 Private right of action**

A. Any person or class of persons that suffers financial injury as a result of a violation of this ordinance,

File #: CB 119990, **Version:** 2

or is the subject of prohibited retaliation under Section 100.050, may bring a civil action in a court of competent jurisdiction against the employer or other person violating this ordinance and, upon prevailing, may be awarded reasonable attorney fees and costs and such legal or equitable relief as may be appropriate to remedy the violation including, without limitation: the payment of any unpaid compensation plus interest due to the person and liquidated damages in an additional amount of up to twice the unpaid compensation; and a penalty payable to any aggrieved party of up to $5,565.10 if the aggrieved party was subject to prohibited retaliation. Interest shall accrue from the date the unpaid compensation was first due at 12 percent per annum, or the maximum rate permitted under RCW 19.52.020.

B. For purposes of this Section 100.260, "person" includes any entity a member of which has suffered financial injury or retaliation, or any other individual or entity acting on behalf of an aggrieved party that has suffered financial injury or retaliation.

C. For purposes of determining membership within a class of persons entitled to bring an action under this Section 100.260, two or more employees are similarly situated if they:

    1. Are or were hired for the same employer or employers, whether concurrently or otherwise, at some point during the applicable statute of limitations period,

    2. Allege one or more violations that raise similar questions as to liability, and

    3. Seek similar forms of relief.

D. For purposes of subsection 100.260.C, employees shall not be considered dissimilar solely because the employees':

    1. Claims seek damages that differ in amount, or

    2. Job titles or other means of classifying employees differ in ways that are unrelated to their claims.

E. An order issued by the court may include a requirement for an employer to submit a compliance report to the court and to the Agency.

File #: CB 119990, **Version:** 2

## 100.265 Waiver

Any waiver by an individual of any provisions of this ordinance shall be deemed contrary to public policy and shall be void and unenforceable.

## 100.270 Encouragement of more generous policies

A. Nothing in this ordinance shall be construed to discourage or prohibit an employer from the adoption or retention of hazard pay policies more generous than the one required herein.

B. Nothing in this ordinance shall be construed as diminishing the obligation of the employer to comply with any contract, collective bargaining agreement, employment benefit plan, or other agreement providing more generous hazard pay policies to an employee than required herein.

## 100.280 Other legal requirements

This ordinance provides minimum requirements for hazard pay for covered employees during the COVID-19 emergency and shall not be construed to preempt, limit, impose additive requirements, or otherwise affect the applicability of any other law, regulation, requirement, policy, or standard that provides for hazard pay, or that extends other protections to employees; and nothing in this ordinance shall be interpreted or applied so as to create any power or duty in conflict with federal or state law. Nor shall this ordinance be construed to preclude any person aggrieved from seeking judicial review of any final administrative decision or order made under this ordinance affecting such person. Nothing in this Section 100.280 shall be construed as restricting an employee's right to pursue any other remedies at law or equity for violation of their rights.

## 100.290 Severability

The provisions of this ordinance are declared to be separate and severable. If any clause, sentence, paragraph, subdivision, section, subsection, or portion of this ordinance, or the application thereof to any employer, employee, person, or circumstance, is held to be invalid, it shall not affect the validity of the remainder of this ordinance, or the validity of its application to other persons or circumstances.

Section 3. Section 3.02.125 of the Seattle Municipal Code, last amended by Ordinance 126189, is

SEATTLE CITY COUNCIL                    Page 31 of 35                    Printed on 2/3/2021
powered by Legistar™
**Exhibit A**
**Page 31 of 35**

File #: CB 119990, **Version:** 2

amended as follows:

### 3.02.125 Hearing Examiner filing fees

A. The filing fee for a case before the City Hearing Examiner is $85, with the following exceptions:

| Basis for Case | Fee in dollars |
|---|---|
| * * * | |
| Fair Employment Practices Ordinance (Chapter) 14.04)) | No fee |
| Floating Home Moorages (Chapter) 7.20)) | 85 per petitioner 255 maximum |
| Hazard Pay for Grocery Employees Ordinance (Ordinance XXXXX) | No fee |
| Land Use Code Citation (Chapter) 23.91)) | No fee |
| * * * | |

* * *

Section 4. Subsection 6.208.020.A of the Seattle Municipal Code, which section was last amended by Ordinance 126108, is amended as follows:

### 6.208.020 Denial, revocation of, or refusal to renew business license

A. In addition to any other powers and authority provided under this Title 6, the Director, or the Director's designee, has the power and authority to deny, revoke, or refuse to renew any business license issued under the provisions of this Chapter 6.208. The Director, or the Director's designee, shall notify such applicant or licensee in writing by mail of the denial, revocation of, or refusal to renew the license and on what grounds such a decision was based. The Director may deny, revoke, or refuse to renew any license issued under this Chapter 6.208 on one or more of the following grounds:

1. The license was procured by fraud or false representation of fact.

2. The licensee has failed to comply with any provisions of this Chapter 6.208.

3. The licensee has failed to comply with any provisions of Chapters 5.32, 5.35, 5.38, 5.39, 5.40, 5.45, 5.46, 5.48, 5.50, or 5.52.

4. The licensee is in default in any payment of any license fee or tax under Title 5 or Title 6.

SEATTLE CITY COUNCIL          Page 32 of 35          Printed on 2/3/2021
powered by Legistar™
**Exhibit A**
**Page 32 of 35**

File #: CB 119990, **Version:** 2

5. The property at which the business is located has been determined by a court to be a chronic nuisance property as provided in Chapter 10.09.

6. The applicant or licensee has been convicted of theft under subsection 12A.08.060.A.4 within the last ten years.

7. The applicant or licensee is a person subject within the last ten years to a court order entering final judgment for violations of chapters 49.46, 49.48, or 49.52 RCW, or 29 U.S.C. 206 or 29 U.S.C. 207, and the judgment was not satisfied within 30 days of the later of either:

a. The expiration of the time for filing an appeal from the final judgment order under the court rules in effect at the time of the final judgment order; or

b. If a timely appeal is made, the date of the final resolution of that appeal and any subsequent appeals resulting in final judicial affirmation of the findings of violations of chapters 49.46, 49.48, or 49.52 RCW, or 29 U.S.C. 206 or 29 U.S.C. 207.

8. The applicant or licensee is a person subject within the last ten years to a final and binding citation and notice of assessment from the Washington Department of Labor and Industries for violations of chapters 49.46, 49.48, or 49.52 RCW, and the citation amount and penalties assessed therewith were not satisfied within 30 days of the date the citation became final and binding.

9. Pursuant to subsections 14.16.100.A.4, 14.17.075.A, 14.19.100.A.4, 14.20.080.A.4, 14.22.115.A.4, 14.23.115.A.4, 14.26.210.A.4, 14.27.210.A.4, 14.28.210.A.4, 14.30.180.A.4, and 14.33.210.A.4, subsection 100.240.A.4 of Ordinance 126091, ((and)) subsection 100.240.A.4 of Ordinance 126094, and subsection 100.240.A.4 of Ordinance XXXXXX, the applicant or licensee has failed to comply, within 30 days of service of any settlement agreement, with any final order issued by the Director of the Office of Labor Standards, or any final order issued by the Hearing Examiner under Chapters 14.16, 14.17, 14.19, 14.20, 14.22, 14.23, 14.26, 14.27, 14.28, 14.29, 14.30, and 14.33, Ordinance 126091 (( , ((and)) Ordinance 126094, and Ordinance XXXXXX for which all appeal rights have been exhausted, and the Director of the

Office of Labor Standards has requested that the Director deny, refuse to renew, or revoke any business license held or requested by the applicant or licensee. The denial, refusal to renew, or revocation shall remain in effect until such time as the violation(s) under Chapters 14.16, 14.17, 14.19, 14.20, 14.22, 14.23, 14.26, 14.27, 14.28, 14.29, 14.30, and 14.33, Ordinance 126091, ((and)) Ordinance 126094, and Ordinance XXXXXX are remedied.

10. The business is one that requires an additional license under this Title 6 and the business does not hold that license.

11. The business has been determined under a separate enforcement process to be operating in violation of law.

\* \* \*

Section 5. This ordinance shall be automatically repealed without subsequent Council action three years after the termination of the civil emergency proclaimed by the Mayor on March 3, 2020.

Section 6. Based on the findings of fact set forth in Section 1 of this ordinance, the Council finds and declares that this ordinance is a public emergency ordinance, which shall take effect immediately and is necessary for the protection of the public health, safety, and welfare.

Section 7. By reason of the findings set forth in Section 1, and the emergency that is hereby declared to exist, this ordinance shall become effective immediately upon its passage by a 3/4 vote of the Council and its approval by the Mayor, as provided by Article 4, subsection 1.1 of the Charter of the City.

Passed by a 3/4 vote of all the members of the City Council the _____ day of

_____, 2020, and signed by me in open session in authentication of its passage this

_____ day of _____, 2021.

_____

File #: CB 119990, **Version:** 2

President _____ of the City Council


Approved / returned unsigned / vetoed this _____ day of _____, 2021.


_____

Jenny A. Durkan, Mayor


Filed by me this _____ day of _____, 2021.


_____

Monica Martinez Simmons, City Clerk


(Seal)