THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTHWEST GROCERY ASSOCIATION, an Oregon non-profit organization, the WASHINGTON FOOD INDUSTRY ASSOCIATION, a Washington non-profit corporation,

                                        Plaintiff,

        v.

CITY OF SEATTLE, a municipal corporation,

                                        Defendant.

Case No. 2:18-cv-00142

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION**
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1

**TABLE OF CONTENTS**

2   I.   INTRODUCTION ............................................................................................. 1

3   II.   FACTS ............................................................................................................ 1

4   III.   LEGAL STANDARD ...................................................................................... 2

5   IV.   ARGUMENT .................................................................................................. 3

6      A. Plaintiffs cannot succeed on the merits ....................................................... 3

7         1.   The Ordinance is a straightforward labor standard, requiring minimum compensation
8              for grocery employees. ............................................................................ 3

9         2.   The National Labor Relations Act does not preempt ordinary wage regulations. ....... 6

10        3.   The Ordinance, subject to only rational basis review, does not violate equal protection
11             guarantees. ......................................................................................... 10

12     B. Plaintiffs have not established irreparable harm in the absence of an injunction. .............. 19

13     C. The balance of equities and the public interest favors of the City. .................................. 23

14   V.   CONCLUSION .................................................................................................. 24

15

16

17

18

19

20

21

22

23

24

25

26

**OPP. TO MOT. FOR PRELIMINARY
INJUNCTION– Page i**
*Northwest Grocery Association et al.  v. City of
Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA  98104-7095
(206) 684-8200

# TABLE OF AUTHORITIES

Cases

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978) .......................................... 13

*Am. Hotel and Lodging Association v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016)... 7

*American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009).... 19

*Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wash.2d 851, 870 (2012)........................... 4

*Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)........................ 19

*Assoc. Builders & Contractors of Cal. Cooperation Comm., Inc. v. Becerra*, 231 F. Supp. 3d
   810, 823–24 (S.D. Cal. 2017) ..................................................................... 8

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)............................... 4

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).......................... 19

*Chamber of Commerce v. Bragdon*, 64 F.3d 497 (9th Cir. 1995). ....................................... 7

*City of Los Angeles v. Lyons,* 461 U.S. 95, 112 (1983).................................................. 2

*Cuviello v. City of Vallejo*, 944 F.3d 816, 831 (9th Cir. 2019)........................................... 2

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).................................. 23

*East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) ......................... 20

*Energy Reserves Grp., Inc. v. Kansas Power & Light Corp.*, 459 U.S. 400, 417 (1983)............ 14

*Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963)............................................................. 11

*Fletcher v. Peck*, 10 U.S. 87, 139 (1810) .................................................................. 12

*Fowler Packing Company, Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016).......................... 17

*Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).......................................... 6

*Hepburn v. Griswold*, 75 U.S. 603, 623 (1869) ........................................................... 12

**OPP. TO MOT. FOR PRELIMINARY
INJUNCTION– Page ii**
*Northwest Grocery Association et al.  v. City of
Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA  98104-7095
(206) 684-8200

*Herb Reed Enters, LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013)................ 19

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444 (1934)..................................... 14

*Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 407 (9th Cir. 2015) ....................... 17

*Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 29 (1905)................................. 11

*Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1031 (9th Cir. 2010).............. 15

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)  20

*Levin v. Commerce Energy, Inc*., 560 U.S. 413, 426 (2010);.................................... 11

*Lewis v. Casey,* 518 U.S. 343, 349–50 (1996) ........................................................ 2

*Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1191 (9th Cir. 2018) ............................... 6

*Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976)......................... 7

*Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 196 Wash.2d 506, 521 (2020)................... 4, 18

*Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976)................................. 11

*Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011) .................. 21

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)................................................................................... 23

*RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004).................4,12, 16, 17

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) ....................................................... 20, 23

*Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018)........................................................ 13

*United States v. Darby*, 312 U.S. 100, 115 (1941)..................................................... 4

*United States v. Williams*, 124 F.3d 411, 422 (3d Cir. 1997)..................................... 12

*Usery v. Turner Elkhorn Mining Co*., 428 U.S. 1, 15 (1976))..................................... 11

*Vazquez v. Jan-Pro Franchising Int'l, Inc*., __F.3d___, 2021 WL 403788, at *9 (9th Cir.

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION– Page iii**
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA  98104-7095
(206) 684-8200

February 2, 2021) (slip copy) ..................................................................... 11

*Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982) ................................. 23

*West Coast Hotel v. Parrish*, 300 U.S. 379, 392 (1937) ..................................... 12

*Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488–89 (1955); .................... 11, 16

**Statutes**

29 U.S.C. §§ 201 et seq. ......................................................................... 14

Ordinance ................................................................................. 2, 3, 9, 16

RCW 49.46 ......................................................................................... 14

SMC 14.19 ......................................................................................... 15

**Court Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................ 4

Fed. R. Civ. P. 8 ..................................................................................... 9

**Other Authorities**

https://seattle.legistar.com/LegislationDetail.aspx?ID=4754242&GUID=80536722-1338-426A-

   A175-DCF61CCAF08F&Options=ID%7cText%7c&Search=# ............................................. 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**OPP. TO MOT. FOR PRELIMINARY
INJUNCTION– Page iv**
*Northwest Grocery Association et al.  v. City of
Seattle* 2:21-cv-00142

1

2

## I.  INTRODUCTION

Plaintiffs seek an extraordinary remedy: immediately halting a minimum compensation law that the City enacted to support grocery store employees during a global pandemic. Granting Plaintiffs' requested relief is inconsistent with controlling law and invites meritless attempts to halt any workplace regulations passed by local governments whenever private businesses disagree with those governments' legislative approach to public health, safety, and welfare. Plaintiffs' attempts to return to a nineteenth century view of the relationship between their private contracts for labor and the public interest should be rejected, particularly given the extreme relief requested. As detailed in Defendant's Motion to Dismiss the Complaint, Plaintiffs' claims are meritless. *See* Dkt. 23. With no likelihood for Plaintiffs' claims to succeed, the balance of equities and public interest tipping sharply in favor of protecting workers and the public, and no irreparable harm at stake, this Court should deny Plaintiffs' Motion for Preliminary Injunction ("Motion" or "Mot.").

## II.  FACTS

The Grocery Employees Hazard Pay Ordinance (Ordinance No. 126274) ("Ordinance") is a minimum compensation law. The Ordinance requires covered grocery businesses to pay covered employees "hazard pay at a rate of four dollars per hour for each hour worked in Seattle…." Ordinance, Section 100.025.A, 100.010. The Ordinance contains provisions preventing the reduction in pay as a result of the Ordinance going into effect and permitting offsets for voluntarily provided hazard pay. *Id.* Section 2, 100.025.A.1-2. The net effect is to ensure a minimum compensation rate for employees of four dollars per hour in addition to their regular compensation.

The Seattle City Council ("Council") made extensive findings in enacting this legislation. Council found that: grocery store employees were "essential workers;" as a result of their contact with the public, these employees are five times more likely to be infected with COVID-19; grocery stores made record profits during 2020; increased COVID-19 transmission was likely; and there were significant uncertainties surrounding vaccination for grocery store employees. *Id.*, Section

1, F, J-N, O-Q.  Council concluded that grocery stores relied upon the work of grocery store employees who are highly vulnerable to health and safety risks to provide essential services.  *Id.*, Section 1, W-BB.  Accordingly, Council found that hazard pay would compensate these workers for the risks they take, improve retention of those workers, permit the employees to access resources they need to stay safe and healthy, support community access to safe and healthy food, and immediately address a critical public health threat.  *Id.*, Section 1, EE, GG, HH, JJ. The Ordinance is temporary; the requirement to pay hazard pay expires when the Mayor ends the emergency she declared on March 3, 2020.  *Id.*, Sections 2, 5.[1]

## III.   LEGAL STANDARD

Preliminary injunctions are an "extraordinary remedy."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To prevail, the moving party "must establish" for each element a "clear showing" that: (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Id.* at 21-22.[2]  *See Cuviello v. City of Vallejo*, 944 F.3d 816, 831 (9th Cir. 2019).  Where an injunction is sought against the actions of government, a higher showing is required of imminent harm.  *City of Los Angeles v. Lyons,* 461 U.S. 95, 112 (1983) ("recognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers ... in the absence of irreparable injury which is both great and immediate'"); *see Lewis v. Casey,* 518 U.S. 343, 349–50 (1996) (separation of powers doctrine weighs against injunctions controlling States).

---

[1] In the recitals preceding the Ordinance, Council made clear its intention to revisit the necessity of the Ordinance in four months.  Ordinance, Recitals.

[2] In the Ninth Circuit, this relief may also be available where "a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" provided that the factors from *Winter* are also established.  *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1132, 1134–35 (9th Cir. 2011).

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION– Page 2 of 24**
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## IV.   ARGUMENT

This Court should deny Plaintiffs' request to enjoin the Ordinance to protect its members' profits or to defend an inchoate notion of its members' reputations.[3]  Plaintiffs' challenge to the Ordinance has no legal merit.[4]  Thus, Plaintiffs cannot establish a likelihood of success on the merits.[5]  Further, Plaintiffs only allege that their members will suffer economic harms and raise unfounded concerns about reputation and goodwill—hardly the sort of harm that would justify the extreme remedy sought.  Finally, the balance of the equities strongly favors denying a preliminary injunction.  Such an injunction is decidedly opposed to the public interest.

### A.  Plaintiffs cannot succeed on the merits.

Plaintiffs claim that they are likely to succeed on their allegations that the Ordinance violates the National Labor Relations Act ("NLRA"), and that the Ordinance violates equal protection guarantees in the federal and state constitutions. Mot. at pp. 6-13.  Not so.  As explained more fully in Defendant's Motion to Dismiss the Complaint (Dkt. 23), neither theory amounts to a legally cognizable claim, let alone is likely to succeed on the merits.

### 1.  The Ordinance is a straightforward labor standard, requiring minimum compensation for grocery employees.

---

[3] On February 25, 2012, the United States District Court for the Central District of California issued an order denying a motion for preliminary injunction brought by California grocery associations against the City of Long Beach.  *See* Attachment A, *California Grocers Association et al. v. Long Beach*, No. 21-00524 (C.D.Cal. February 25, 2021) (Dkt. 18, Order denying preliminary injunction).  Plaintiffs in *California Grocers Association* brought nearly identical challenges to a very similar ordinance requiring hero pay for grocery store employees.  *Id.* at pp. 1-5.  The District Court found that "[a] preliminary injunction is not warranted because CGA fails to establish a likelihood of success on the merits."  *Id.* at p. 4.

[4] *See generally* Dkt. 23, Defendant's Motion to Dismiss.

[5] The standard for defeating a motion for preliminary injunction is substantially lower than the standard required to succeed on a motion to dismiss a complaint.  *See Peri on behalf of Peri v. Bank of New York Mellon*, 2020 WL 6874880, at *2 (W.D. Wash. Nov. 23, 2020) (slip copy) ("the requirements necessary for [plaintiff] to be granted a preliminary injunction are more stringent than the pleading requirements necessary for plaintiff to state a claim for which relief can be granted").  Accordingly, where a party prevails on a motion to dismiss, they have also inevitably shown that the plaintiff's motion for preliminary injunction has no likelihood of success on the merits. *See, e.g.*, *Doe v. Fed. Dist. Court*, 467 Fed. Appx. 725, 728 (9th Cir. 2012) (unreported) ("Because [plaintiff's] complaint was insufficient to survive a motion to dismiss for failure to state a claim, she could not show a strong likelihood of success on the merits. It was therefore not an abuse of discretion to deny the motions for a preliminary injunction as moot").

Plaintiffs' claims in this matter rest on an incorrect understanding of the purpose of minimum wage laws. Plaintiffs apparently believe that the only public purpose for minimum wage laws is to prevent working people from being a "burden on public services." Mot. at p. 2. This wholly misstates the critical public purposes of minimum compensation laws. Minimum compensation laws are intended "to protect all covered workers from substandard wages" and oppressive working conditions. *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (discussing the Fair Labor Standards Act); *see RUI One Corp.*, 371 F.3d at 1141 ("Recognizing the plight of its own working poor, the City of Berkeley, California, has joined dozens of other cities nationwide to help bridge the gap between federal and state laws setting the minimum wage—the real value of which has decreased over the past few decades—and the costs of modern urban living by enacting 'living wage' ordinances.").

These laws are critical to health, safety, and general well-being of covered workers. *Barrentine*, 450 U.S. at 739. Indeed, "minimum wage laws have a remedial purpose of protecting against 'the evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health,'" *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wash.2d 851, 870 (2012) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 361 (1945)); *see Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 196 Wash.2d 506, 521 (2020) (recognizing that the Washington State minimum wage law  is "[n]ecessary to safeguard the health, safety, and general welfare of Washington citizens"). Minimum labor standards also serve to protect businesses that account for the health, safety, and well-being of workers from unfair competition by businesses that profit at the expense of their own workers. *See*, *e.g.*, *United States v. Darby*, 312 U.S. 100, 115 (1941) (recognizing that a purpose of the Fair Labor Standards Act is to protect law-abiding businesses from competition based on "substandard labor conditions"). The application of the State's police power to set minimum compensation for workers clearly extends beyond keeping workers just above starvation wages.

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION**– Page 4 of 24
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA  98104-7095
(206) 684-8200

1   Plaintiffs' misunderstanding of the purpose of minimum compensation laws, coupled with

2   a misreading of the Ordinance's requirements, results in a gross mischaracterization of the

3   Ordinance and its effects.   First, Plaintiffs claim that the Ordinance requires "specific increase

4   ($4/hour) in the baseline hourly wage, *while outlawing any modification that could reduce the*

5   *employee's compensation in* any way."  Mot. at p. 8 (emphasis in the original); *see* Mot. at p. 1

6   ("the Ordinance appears to outlaw any actions that grocery stores could take to mitigate a sudden

7   20-30% spike in labor costs.").  This is incorrect.  The Ordinance only prohibits employers from

8   taking "steps to reduce employee compensation so as to prevent, in whole or in part, employees

9   from receiving hazard pay" where those reductions to employee pay are made "as a result of this

10  ordinance going into effect…."  Ordinance, Section 2, 100.025.A.1.  The Ordinance does not

11  restrict covered employers from changing their business in ways that would allow them to increase

12  their profits, like reorganizing operations.  For example, a company like Kroger, which has touted

13  to investors an operating profit of $871 million for its most recent fiscal quarter (a 33% increase

14  from a year earlier),[6, 7] may still modify its business in a variety of ways that do not affect employee

15  compensation, including choosing to forgo or reduce their billion-dollar stock buyback practices

16  in order to account for a modest increase in labor costs.[8]

17      Second, Plaintiffs mischaracterize the central command of the Ordinance as a "mandatory

18  fixed wage supplement[,]" Mot. at p. 8, that requires covered employers to "pay the maximum

---

[6] *Kroger Reports Third Quarter 2020 Results and Raises Full-Year 2020 Guidance*, https://tinyurl.com/2v5abena (last visited March 1, 2021).

[7] This Court may take judicial notice of information "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Newspaper reports, as cited herein, easily meet this standard.  *See Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 459 (9th Cir. 1995) (approving judicial notice of layoffs at defendant's workplace in an ERISA anti-retaliation suit based on newspaper articles as "a fact which would be generally known in Southern California and which would be capable of sufficiently accurate and ready determination").

[8] *Kroger Closing More Stores: Here's Which Seattle Locations Are Shuttering*, https://tinyurl.com/gwe697f4, (last visited March 1, 2021) (Kroger also bought back $989 million in stock during that time, with the board authorizing an extra $1 billion in share repurchases).

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION– Page 5 of 24**
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

premium even if the employer is already paying a pandemic-related wage premium, as some Seattle grocers currently are." Mot. at p. 4. The plain language of the Ordinance refutes this interpretation: covered employers "providing hazard pay . . . on the effective date of this ordinance may use the hourly rate of that hazard pay to offset the amount due under this subsection" Ordinance, Section 2, 100.025.A.2. In fact, since the Ordinance's enactment, some grocery stores in Seattle voluntarily provide hazard pay. Trader Joe's agreed to provide temporary pay of four dollars per hour for its workers nationwide;[9] and PCC Community Markets implemented a temporary four dollar per hour wage increase to all of its nearly 1,500 employees in its 15 locations, beyond the eight stores within Seattle.[10] As Trader Joe's and PCC provided the minimum hazard pay of four dollars per hour, the Ordinance does not require them to pay more.

### 2. The National Labor Relations Act does not preempt ordinary wage regulations.

Plaintiffs' mischaracterization of the nature of the Ordinance entails further errors about the relationship between the Ordinance and federal labor law.[11] As a threshold matter, Plaintiffs cannot overcome the presumption against federal law preemption of the City's valid use of its police powers. "Pre-emption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred.'" *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987)). Thus, the City's regulation of compensation, through the Ordinance, must be presumed not to be preempted by federal laws. *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1191 (9th Cir. 2018) (federal law preemption starts with the "assumption that the State's historic police powers are not preempted" unless there is a "clear and manifest" Congressional intention to do so).

Particularly, federal protections for collective bargaining do not preempt local police power

---

[9] *See Kroger to close two more stores after workers get "hazard pay"*, https://tinyurl.com/1ar1h8tg (last visited March 1, 2021).
[10] *Id.*
[11] *See* Dkt. 23, Defendant's Motion to Dismiss, at pp. 10-14.

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION**– Page 6 of 24
*Northwest Grocery Association et al. v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1  regulations of working conditions that are not directly tied to collective bargaining activities. The

2  NLRA has no express preemption clause; rather courts have read into the Act two varieties of

3  federal preemption. *Metro. Life Ins. Co. v. Mass*, 471 U.S. 724 (1985). Plaintiffs in this matter

4  have only alleged preemption under one theory, the so-called *Machinists* doctrine. *See* Complaint

5  at ¶ 25 (citing *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976)); *see*

6  *also* Motion at p. 6 ("the *Machinists* doctrine… is relevant here"). This type of preemption forbids

7  states from restricting economic weapons of self-help in order to "establish[] an equitable *process*

8  for determining terms and conditions of employment" though, critically, it does not reach state

9  laws affecting the "particular substantive terms of the bargain." *Metro. Life Ins. Co.*, 471 U.S. at

10  753 (emphasis supplied).

11  *Machinists* preemption does not apply to the Ordinance. Substantive state labor standards,

12  applicable to union and non-union employees, form the backdrop for bargaining, and are therefore

13  not preempted by the NLRA. *See* Motion to Dismiss, Dkt. 23 at pp. 11-13. Relevant here, the

14  Ninth Circuit applied this concept to a similar wage rate ordinance in Los Angeles, concluding it

15  was not preempted by the NLRA. *Am. Hotel and Lodging Association v. City of Los Angeles*, 834

16  F.3d 958, 963 (9th Cir. 2016).

17  Perhaps aware that well-settled law does not support their position, Plaintiffs rely entirely

18  on the easily distinguishable *Chamber of Commerce v. Bragdon*, 64 F.3d 497 (9th Cir. 1995). Mot.

19  at p. 7. There, the Ninth Circuit held that the NLRA preempted a county ordinance that set

20  prevailing wages solely by reference to a collective bargaining agreement. *Bragdon*, 64 F.3d 497.

21  As the Ninth Circuit has clarified, state law was preempted in *Bragdon* because the law required

22  private, non-union employers to adopt collectively bargained wages from third parties. *Associated*

23  *Builders & Contrs. Of S. Cal. v. Nunn*, 356 F.3d 979 991 (9th Cir. 2004). Critically, *Bragdon* itself

24  distinguished minimum wage laws from the offending law, acknowledging that minimum wage

laws are *not* preempted by the NLRA.  *Id*. at 991 & n.8 (citing *Bragdon*, 64 F.3d at 502).

Ultimately, *Bragdon's* holding has been narrowly applied to its set of facts.  *Id*. at 990 ("*Bragdon* must be interpreted in the context of Supreme Court authority and our other, more recent rulings on NLRA preemption."); *see Am. Hotel*, 834 F.3d at 965 n.5 (distinguishing the living-wage law under review from *Bragdon*'s prevailing wage law); *Assoc. Builders & Contractors of Cal. Cooperation Comm., Inc. v. Becerra*, 231 F. Supp. 3d 810, 823–24 (S.D. Cal. 2017), *aff'd*, 898 F.3d 879 (9th Cir. 2018) (recognizing the retreat from *Bragdon*).

The City's Ordinance does not dictate private employers' wages by pegging them to a third-party, collectively bargained agreement.  Indeed, as Plaintiffs apparently agree, the Ordinance is wholly *neutral* with respect to bargained-for wages.  *See*, Complaint at ¶ 28 (noting that the hazard pay requirement applies "regardless of the wage negotiated in the current collective bargaining agreements"); *see also* Mot. at p. 8 (alleging that the Ordinance has "disparate impacts on union and non-union workers" because it does not consider collectively bargained wages). Clearly, *Bragdon* does not apply.

In its order denying a motion for a preliminary injunction in the similar case *California Grocers Association v. Long Beach*, the District Court for the Central District of California analyzed NLRA preemption, relying on many of the cases cited here.  *See* Attachment A, at pp. 5-9.  The court recognized that *Machinists* preemption was concerned with ensuring an "equitable bargaining process" and the fact that a law "pertains to matters over which" the parties may bargain "cannot support a claim of pre-emption...."  *Id*. at p. 5 (quoting *Fort Halifax*, 482 U.S. at 20).  The court cautions against an extreme preemption example that does not exist in that case nor does it exist here:  "[i]f the [o]rdinance really does prohibit *any* collective bargaining by the grocers to

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION**– Page 8 of 24
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA  98104-7095
(206) 684-8200

mitigate increase labor costs that result from the [o]rdinance" then it could be that *Machinists*

preemption would apply. *Id*. at p. 7 (emphasis in the original). Like the ordinance in *Long Beach*,

the Ordinance, here, does not prohibit *any* collective bargaining to mitigate labor costs. It simply

requires minimum compensation and restricts action taken to reduce *compensation*. The

Ordinance is silent about other terms over which bargaining may occur. In fact, in response to the

Ordinance, PCC Community Markets collectively bargained with its union to not only provide the

four dollar minimum compensation, but also negotiated other substantive terms including: new

curbside pickup services, providing quarantine pay and time off for employees who get diagnosed

with COVID-19, as well as other safety provisions.[12] This is an obvious example that an equitable

bargaining process can exist against the backdrop of the Ordinance here.

The *California Grocers Association* court did not fully assess the scope of NLRA

preemption.[13] As noted *supra*, there is a starting presumption that Congress did not intend to

preempt state laws reflecting traditional police power regulations, like those affecting employment

relationships. *Norris*, 512 U.S. at 252. This is true in the context of *Machinist* preemption, where

the Supreme Court held "[t]he evil Congress was addressing [under 29 U.S.C. §§ 157-158] was

*entirely unrelated* to local or federal regulation establishing minimum terms of employment."

*Metro Life Ins. Co.*, 471 U.S. at 754 (emphasis supplied). Explained in detail,

> Neither inequality of bargaining power nor the resultant depressed wage rates were
> thought [by Congress] to result from the choice between having terms of
> employment set by public law or having them set by private agreement. No
> incompatibility exists, therefore, between federal rules designed to restore the
> equality of bargaining power, and state or federal legislation that imposes minimal

---

[12] *PCC Community Markets Paying All Puget Sound Hourly Store Staff Additional $4 Per Hour Hazard Pay*,
https://tinyurl.com/yf7rw8wh (last visited March 1, 2021).
[13] The court also applied *Bragdon* beyond the limits set by the Ninth Circuit in *Nunn*. *See* Attachment A at pp. 6-7.

**OPP. TO MOT. FOR PRELIMINARY
INJUNCTION– Page 9 of 24**
*Northwest Grocery Association et al.  v. City of
Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

substantive requirements on contract terms negotiated between parties to labor agreements….

471 U.S. at 754.  The *California Grocers Association* Order's reasoning is inconsistent with binding precedent.  The court's view would "further few of the purposes of" the NLRA because, in allowing "unions and employers to bargain for terms of employment that state law forbids employers to establish unilaterally" the rule "delegate[s] to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored."  *Id.* at 755 (internal quotation marks omitted)

As with Plaintiffs' contention that their private contracts for labor are impaired by the Ordinance (*see infra*), adopting the *California Grocers Association* order on this point would improperly preference Plaintiffs' contracts over the public interest.  Like minimum wage or any other minimum labor standards, the NLRA does not permit bargaining parties to go below those minimums.  *See, e.g., Barrentine,* 450 U.S. 728, 740-741 (1981) (noting that "congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement") (collecting cases).  The portion of the *California Grocers Association* order implying that setting a minimum pay rate below which employers may not go could be preempted by the NLRA is contradicted by voluminous controlling Supreme Court and Ninth Circuit precedent.  This Court should decline to extend that court's reasoning.

Plaintiffs cannot succeed on the merits of their claim for NLRA preemption.  The hazard pay required by the Ordinance applies to union and non-union employees, and is therefore neutral toward the bargaining process and not preempted by the NLRA.

### 3.  The Ordinance, subject to only rational basis review, does not violate equal protection guarantees.

#### a.  The Ordinance is entitled to considerable deference.

The Ordinance is a just application of the City's police powers regulating working

conditions.  *See* Motion to Dismiss, Dkt. 23 at pp. 5-10.   It is therefore a "legislative act[] 'adjusting the burdens and benefits of economic life [that] come[s] to the Court with a presumption of constitutionality.'" *Vazquez v. Jan-Pro Franchising Int'l, Inc*., __F.3d___, 2021 WL 403788, at *9 (9th Cir. February 2, 2021) (slip copy) (quoting *Usery v. Turner Elkhorn Mining Co*., 428 U.S. 1, 15 (1976)) (alterations supplied).  Indeed, where laws do not employ suspect classifications or impinge on fundamental rights, courts "view constitutional challenges with the skepticism due respect for legislative choices demands."  *Levin v. Commerce Energy, Inc*., 560 U.S. 413, 426 (2010); *Williamson v. Lee Optical of Oklahoma, Inc*., 348 U.S. 483, 488–89 (1955)); *see also Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.").  Exercises of the local police power are entitled to even greater deference in the context of public health emergencies.  *See* Motion to Dismiss, Dkt. 23 at pp. 7-9.  "'Under the pressure of great dangers,' constitutional rights may be reasonably restricted 'as the safety of the general public may demand.'"  *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020) (alterations removed) (quoting *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 29 (1905)).

        *b.   Plaintiffs' attempt to invoke heightened scrutiny fails.*

      "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  Plaintiffs do not contend, nor could they, that the Ordinance employs suspect classifications.  Instead, they attempt to circumvent rational basis review—and cloak their baseless

contract clause theory in equal protection language[14]—by asserting that the Ordinance interferes with a fundamental right to contract, a position which has no support in modern-day jurisprudence.

While Plaintiffs maintain that "the right guaranteed by federal Contract Clause is 'fundamental,'" *id.*, their reliance on nineteenth century cases for this proposition speaks volumes. *See id.* at 9-10 (citing *Fletcher v. Peck*, 10 U.S. 87, 139 (1810); *Hepburn v. Griswold*, 75 U.S. 603, 623 (1869)). The notion that laws infringing on private contracts implicate fundamental rights rests on a conception of private contractual rights that has not been the law since the 1930s. Dkt. 23, at 14-15, 20; *see West Coast Hotel v. Parrish*, 300 U.S. 379, 392 (1937) (recognizing the "power under the Constitution to restrict freedom of contract" as to labor contracts); *see also* Attachment A at p. 12 (rejecting an attempt to turn the contract clause into a fundamental right).

Plaintiffs do not cite a single case where a court applied strict scrutiny to an equal protection claim based on a purported interference with contracts, and the City is aware of no such authority. Again, at least one circuit court expressly declined to do so. Dkt. 23 at p. 20 (citing *United States v. Williams*, 124 F.3d 411, 422 (3d Cir. 1997)). Instead, courts apply rational basis review to laws regulating economic activity—including minimum wage legislation. Dkt. 23 at pp. 20-21; *see, e.g., RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004) (applying rational basis review in an equal protection challenge to minimum wage legislation, notwithstanding concurrent Contract Clause claim).

Even if interference with private contracts triggered strict scrutiny, Plaintiffs' spurious

---

[14] In denying the preliminary injunction in *California Grocers Association*, the court correctly expressed skepticism about the propriety of merging the standards of review for contract clause claims and equal protection. Attachment A at pp. 12, 16.

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION– Page 12 of 24**
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1  argument that a minimum compensation standard impairs their members' preexisting contracts for

2  labor is meritless.  Under long settled Supreme Court precedent, a law only unconstitutionally

3  impairs a contract if it "substantially impairs" a contract, and laws cannot substantially impair

4  contracts where they represent a continuation of pre-existing regulation.  Dkt. 23, pp. 15-17; *see*

5  *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018) (citing *Allied Structural Steel Co. v. Spannaus*, 438

6  U.S. 234, 244 (1978)) (acknowledging that substantial impairment is a "threshold" and so failure

7  to find substantial impairment may end the inquiry).  Here, grocery stores are subject to extensive

8  workplace regulation, including minimum wage laws (the Fair Labor Standards Act, Washington

9  Minimum Wage Act, and the City's Minimum Wage Ordinance) and the City's Wage Theft

10  Ordinance (Seattle Mun. Code 14.20).  The Ordinance, imposing a wage regulation very similar

11  to the Minimum Wage and Wage Theft Ordinances that already apply to Plaintiffs' members'

12  employees, is *not* a substantial impairment of Plaintiffs' contracts for labor.

13     Plaintiffs' attempt to rely on *Spannaus* is particularly misplaced.  Mot. at p. 10.  Plaintiffs

14  cite *Spannaus* for the proposition that retroactive modification of any "compensation" substantially

15  impairs contracts for the purpose of the Contracts Clause.  *Id*.  This ignores the facts of *Spannaus*.

16  There, the Supreme Court considered a State law that regulated pension plans, requiring that they

17  be properly funded.  *Spannaus*, 438 U.S. at 238-39.  The Court specifically held, "[t]he company…

18  had no reason to anticipate that its employees' pension rights could become vested except in

19  accordance with the terms of the plan" and so their contracts were impaired by the law.  *Id*. at 245-

20  246 (citing, *inter alia*, the Employee Retirement Income Security Act which prioritize plan policies

21  over state laws).  Here, hourly wages paid to grocery employees are already extensively regulated

22  by minimum wage and other laws.  Plaintiffs' members could scarcely be said to have "no reason"

to anticipate that further regulation of their employees' wages would occur.

If any further justification were necessary, the Ordinance is constitutionally sound because it addresses a "significant, legitimate public purpose," and the means chosen to achieve that purpose pass a rational basis test. Dkt. 23, pp. 17-19. In this case, the parties agree that the services provided by grocery employees are critical to responding to ongoing public health crisis. Certainly, responding to the pandemic qualifies as a "significant, legitimate, public purpose." *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444 (1934) (upholding an eviction moratorium because, in part, it was an emergency law responding to the Great Depression); *cf. Energy Reserves Grp., Inc. v. Kansas Power & Light Corp.*, 459 U.S. 400, 417 (1983). The Ordinance's method of responding to this public health crisis, mandating hazard pay for grocery employees, clearly meets the rational basis review to which it would be subject. *See Energy Reserves*, 459 U.S. 412-413 ("[u]nless the State itself is a contracting party . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure"); *see also* Section IV.A.3.c *infra*

Perhaps recognizing that the Ordinance does not unconstitutionally impair contracts, Plaintiffs suggest that the Ordinance need only implicate—not violate—state and federal protections against interference with contracts. *See* Mot. at p. 11 n. 1. Plaintiffs' theory finds no support in the authorities Plaintiffs cite. In any event, the Court should reject this absurd proposition, which amounts to an impermissible end-run around modern-day Contracts Clause jurisprudence. If Plaintiffs were correct, a plaintiff who could not make the requisite showing under the Contracts Clause would nevertheless be entitled to strict scrutiny under the Equal Protection Clause. Further, contrary to settled law, legislation concerning employment standards

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION– Page 14 of 24**
*Northwest Grocery Association et al. v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1    would be subject to strict scrutiny on the basis that it "implicated" the Contracts Clause.

2        In short, interference with private contractual agreements for purchasing labor does not

3    trigger heightened scrutiny under the Equal Protection Clause, and even if it did, strict scrutiny

4    would be unavailable here because the Ordinance does not unconstitutionally impair Plaintiffs'

5    contracts. The Ordinance is subject to rational basis review. *Murgia*, 427 U.S. at 312.

6            *c.  The Ordinance readily survives rational basis review.*

7        Rational basis review is "the most relaxed and tolerant form of scrutiny under the Equal

8    Protection Clause." *Dallas v. Stanglin*, 490 U.S. 19, 26 (1989); *see* Dkt. 23 at p. 21 n. 19.  A law

9    will survive rational basis review "if there is any reasonably conceivable state of facts that could

10   provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc*., 508 U.S.

11   307, 313 (1993).

12       Plaintiffs decry the lack of empirical support for Council's stated purposes, maintaining

13   that the Ordinance will do nothing to protect public health, address economic security, or promote

14   retention of grocery workers.  Mot. at pp. 11-13.  There is no merit to this line of attack.  Under

15   rational basis review, "a state action need not *actually* further a legitimate interest; it is enough

16   that the governing body '*could have rationally decided* that' the action would further that interest."

17   *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1031 (9th Cir. 2010) (quoting

18   *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981)); *see also F.C.C.*, 508 U.S. at

19   313 ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational

20   speculation unsupported by evidence or empirical data.").  Here, Council undeniably had a rational

21   basis for the Ordinance.

22       Council rationally decided the Ordinance promotes public health.  Higher pay equips

**OPP. TO MOT. FOR PRELIMINARY
INJUNCTION– Page 15 of 24**
*Northwest Grocery Association et al.  v. City of
Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

workers to purchase more effective personal protective equipment and reduce reliance on public transit. *See Rancho Santiago Cmty. Coll. Dist.,* 623 F.3d at 1031; Ordinance Section 1.JJ (finding that hazard pay "improves the financial ability of grocery employees to access resources they need to stay safe and healthy"). Council determined that increasing hourly pay improves economic security among grocery workers. The Court should decline Plaintiffs' invitation to engage in "courtroom fact-finding" on whether the Ordinance rests on a sound economic analysis. The same is true of Council's intent to increase retention among grocery workers; hazard pay is a widely recognized mechanism to retain workers in dangerous occupations. Plaintiffs ignore a fourth, and unassailable, basis for the Ordinance: to compensate grocery workers for the serious—and potentially increasing—risk of exposure to COVID-19 at the workplace. *See* Ordinance, Section HH. Council rationally could have determined that these risks entitled such workers to hazard pay. Indeed, some of Plaintiffs' members made the same determination when they voluntarily provided "hero pay" to their employees.

Plaintiffs also attack the Ordinance on the ground that it applies only to grocers of a certain size and does not extend to other frontline workers. Mot. at pp. 11-12. But line-drawing of this nature is "'virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally.'" *RUI One Corp.*, 371 F.3d at 1155 (quoting *F.C.C.*, 508 U.S. at 316). "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson*, 348 U.S. at 489. And "[i]t is legitimate and rational for the City to set minimum wage[s] based on economic factors, such as the ability of employers to pay those wages." *Int'l*

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1    *Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 407 (9th Cir. 2015).

2           Plaintiffs' reliance on *Fowler Packing Company, Inc. v. Lanier*, 844 F.3d 809, 815 (9th

3    Cir. 2016) is misplaced.   The court in *Fowler* readily acknowledged that courts "defer to

4    legislatures in the necessary process of regulatory line drawing," that rational basis review is not

5    "a license for courts to judge the wisdom, fairness, or logic of legislative choices," and that if

6    courts "find a plausible reason" for a challenged action, their "inquiry is at an end." *Id*. at 815

7    (internal quotation marks and alterations omitted).  In *Fowler*, however, the challenged legislation

8    could not withstand rational basis review because the court "*could conceive of no other reason*

9    why the California legislature would choose to carve out three employers [from a law benefiting

10   employers] other than to respond to the demands of a political constituent." *Id*. (emphasis

11   supplied).[15]  Here, in stark contrast, "plausible" bases abound for Council's decision to require

12   hazard pay for a class of essential workers facing documented health and safety risks.

13          Finally, Plaintiffs contend that the Ordinance fails even rational basis review on account of

14   the "purely political justification for its passage."  Mot. at 13.  The protections in the Ordinance

15   apply to union and non-union grocers alike, belying Plaintiffs' notion that the legislation was

16   merely a political favor.  *See* Mot. at 13.  Even if Council's motivations were "purely political"

17   and its stated rationales mere pretext, the Ordinance still withstands scrutiny.  "[I]t is entirely

18   irrelevant for constitutional purposes whether the conceived reason for the challenged distinction

19   actually motivated the legislature." *F.C.C.*, 508 U.S. at 315; *RUI One Corp*. (rejecting equal

---

[15] Plaintiffs also rely on *Ketcham v. King County Medical Service Corporation*, 81 Wn.2d 565, 576 (1979) for the unremarkable proposition that "legislatures may not draw arbitrary lines."  Mot. at 13.  *Ketcham* is inapposite, as it did not involve Equal Protection claims. 81 Wn.2d at 567.

**OPP. TO MOT. FOR PRELIMINARY
INJUNCTION– Page 17 of 24**
*Northwest Grocery Association et al.  v. City of
Seattle* 2:21-cv-00142

protection challenge to minimum-wage law despite plaintiff's contention that city's stated reasons for challenged legislation "were not the real reasons" and that city council "was instead motivated by a desire to help in the unionization campaign").

Because the Ordinance is subject to nothing more than rational basis review, and because it readily meets this standard, Plaintiffs are unlikely to prevail on their Equal Protection claim.[16]

> d. *Washington's Privileges and Immunities Clause does not command a different result.*

Plaintiffs' discussion of Washington "equal protection provisions" reflects a gross misunderstanding of Washington law.  *See* Mot. at 10.  Plaintiffs do not so much as mention the relevant constitutional provision, Article I, section 12.  *See id.* at 8 (referencing nonexistent provision of Washington Constitution) & 10 (discussing "Washington's equal protection provisions" generally).  Instead, Plaintiffs merely assert that the Washington Constitution extends broader protections than its federal counterpart.  *Id.* at 10.

But Article I, section 12 generally provides the same protections, and requires the same analysis, as the federal Equal Protection Clause.  *Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 196 Wash.2d 506, 518-19 (2020); *see* Dkt. 23 at pp. 23-24.  An independent analysis is required only when "a law implicates a 'privilege or immunity' as defined in our early cases distinguishing the fundamental rights of state citizenship.'"  *Martinez-Cuevas*, 196 Wash.2d at 518-19.  The Ordinance does not come within this exception because Plaintiffs have identified no fundamental right of state citizenship at play here.  Plaintiffs point to no authority that would allow the Court

---

[16] Even if the Court were inclined to apply strict scrutiny, Plaintiffs would be unlikely to prevail on the merits.  Because it targets a class of workers who face unique and documented risks in the workplace, the Ordinance is narrowly tailored to serve a compelling governmental interest.  *See., e.g., Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION– Page 18 of 24**
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

to conclude that "legislative interference with existing contracts" implicates a fundamental right of state citizenship under Article I, section 12.  *See generally* Mot. at 10; *see also* Dkt. 23 at pp. 23-24.  Indeed, because the contract clauses under the state and federal constitutions are coextensive, modern jurisprudence rejecting *Lochner*-era conceptions of private contracts forecloses an independent analysis under Article I, section 12.[17]

**B. Plaintiffs have not established irreparable harm in the absence of an injunction.**

Plaintiffs fall far short of establishing a likelihood of irreparable harm without an injunction.  *Cf.* Mot. at p. 14 (citing *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009)).  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Conclusory or speculative allegations are insufficient to establish a likelihood of irreparable harm.  *Herb Reed Enters, LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").  Instead, "a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co., Inc.*, 844 F.2d at 674) (emphasis in original).

---

[17] Even if the Ordinance implicated a fundamental right for purposes of Article I, section 12, Plaintiffs would be unlikely to succeed on the merits, because there is a "reasonable ground" for the distinction between grocery employers and other businesses. *Martinez-Cuevas*, 196 Wash.2d at 519, 523.  At the very least, it is beyond dispute that providing additional pay to grocery workers helps compensates these workers for the well-documented hazards they face.

Plaintiffs allege only speculative, primarily economic harms.[18]  Mot. at pp. 14-15; *see* Declaration of Michael Sandberg ("Sandberg Decl.") at ¶ 3; Declaration of Stephen Mullen at ¶ 3; Declaration of Tammie Hetrick ("Hetrick Decl.") at ¶¶ 6, 9; Declaration of Teresa Robbs ("Robbs Decl.") at ¶¶ 2-5.  The principal harms cited by Plaintiffs are monetary, in the form of additional compensation they must pay under the Ordinance.  *See*, *e.g.*, Sandberg Decl. at ¶ 3.  It is well settled that monetary injury does not amount to irreparable in the context of a preliminary injunction.  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980); *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020).  "The key word in this consideration is *irreparable*.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended … are not enough."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotation marks and citation omitted, emphasis supplied).[19]

Further, Plaintiffs' assertions about "reputational harm" and loss of "goodwill" are speculative and based only on conclusory statements.  Mot. at p. 14.  The CEO for Plaintiff Washington Food Industry Association, who is not herself the owner or operator of any grocery store, postulates that referring to the mandated pay as "hazard pay" will cause people to believe that grocery stores are "hazardous."  Hetrick Decl. at ¶ 9.  Unsurprisingly, Plaintiffs offer no support for these vague allegations of reputational harm—which defy common sense in the context

---

[18] To the extent that Plaintiffs seek to elevate their constitutional claims to the level of irreparable harm, they have no basis to do so.  *See  Sierra Club v. Trump*, 379 F. Supp. 3d 883, 905 (N.D. Cal. 2019), *aff'd*, 963 F.3d 874, 925 (9th Cir. 2020), *cert. petition filed*, No. 20-138 (Aug. 7, 2020) (citing *American Trucking Ass'ns*, 559 F.3d at 1058-1059) (Under the "theory of irreparable harm" adopted in *American Trucking*, "Plaintiffs must demonstrate some likely irreparable harm in the absence of a preliminary injunction barring the challenged action, and not simply a constitutional violation").

[19] Though Plaintiffs' claims lack all merit, whatever harm they may have suffered could be fully remediated by money damages, and as such, does not warrant an immediate injunction.

of the commonly understood risks facing grocery workers. Consequently, they are simply too speculative to constitute an irreparable injury or justify the extraordinary relief. *See, e.g., Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011) (refusing to enter a preliminary injunction where the plaintiff "entirely failed to submit any proof beyond speculation as to its reputation or goodwill in the relevant market… leav[ing] the court with no basis upon which to evaluate any intangible harm").

Also undercutting Plaintiffs' assertion of irreparable harm is the fact that some of its members, including Kroger, [20] PCC Community Markets, [21] and Trader Joe's,[22] currently provide or previously provided some amount of "hero pay" on their own volition. When Kroger ended its "hero pay," it was reported that Kroger's CEO received $21.1 million in compensation for 2019, compared to the typical worker, who took home less than $27,000 in pay and benefits. [23] While Plaintiffs malign the "widely-publicized public policy report" cited in the Ordinance's findings. Mot. at p. 1, other publicly available information corroborates the Ordinance's findings—that Kroger has notched record earnings during the pandemic. [24] In any event, grocery businesses' voluntary action to provide hazard pay to their frontline employees casts serious doubt on the magnitude and irreparable nature of the harm Plaintiffs' members purportedly face.

Despite the skyrocketing profits the pandemic has brought to the grocery industry,

---

[20] *See Kroger to close two more stores after workers get "hazard pay"*, https://tinyurl.com/1ar1h8tg (last visited March 1, 2021); *Some grocery workers "scared to death" to return to work*, https://tinyurl.com/dr3xtupj (last visited March 1, 2021).
[21] *Id.* (PCC Community Markets extending four dollar increase to all of its nearly 1,500 employees in its 15 locations, beyond the eight stores within Seattle) (last visited March 1, 2021).
[22] *Id.* (Trader Joe's raising pay by four dollars an hour for its workers nationwide) (last visited March 1, 2021).
[23] *CEO pay at Tenet Healthcare, Kroger, other firms comes under microscope as companies cut costs*, https://tinyurl.com/r0witoff (last visited March 1, 2021).
[24] *Kroger to close more stores instead of giving workers hazard pay*, https://tinyurl.com/ez0hp0hr (last visited March 1, 2021).

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Plaintiffs attempt to paint the impending closures of two grocery stores, operated by member-QFC, as evidence of irreparable harm. *See* Robbs Decl. at ¶ 2-5.[25] The Court should disregard Plaintiffs' self-serving, eleventh-hour declaration to this effect, as it rests entirely on speculation. *See Herb Reed Enters., LLC.*, 736 F.3d at 1250. But even if the Court credits these allegations, Plaintiffs cannot escape the reality that the two closing stores were "underperforming" long before the Ordinance. *See* Robbs Decl. at ¶¶-4-5.[26] Indeed, QFC acknowledges that it spent between $300,000 and $600,000 across the two planned store closures on "remodels in the last few years," admitting that the two stores were "the most expensive to operate."[27] Kroger's Regional CFO even concedes that one of the closing stores "has been unprofitable during the pandemic," Robbs Decl. at ¶ 4, suggesting that its premature closure may *improve* Kroger's bottom line. In any event, these operational decisions have occurred at a time when QFC's parent company, Kroger, bought back $989 million in stock, with the board authorizing an extra $1 billion in share repurchases.[28] Plaintiffs' attempt to scapegoat the law for actions that QFC was already planning to take is disingenuous and unfair to its essential workers.

The City is aware of no authority suggesting that a discretionary business closure—much less a mere acceleration of a closure that was already slated to occur—constitutes a harm for which there is no adequate legal remedy. Particularly in the face of record earnings, Kroger had ample

---

[25] Signed on February 22, this declaration was not filed until February 26, 2021—the eve of the filing deadline for the City's Opposition to Plaintiffs' Motion. The City reserves the right to supplement its Opposition to further respond to this late-filed declaration.

[26] *See also QFC to close two Seattle stores, blames city's new $4 hazard pay law*, https://tinyurl.com/4xylhp6s (last visited March 1, 2021).

[27] *Seattle QFC store closures will affect 109 employees*, https://tinyurl.com/96g8lkfe (last visited March 1, 2021); *QFC says will lay off 109 workers in Seattle hazard pay closures including 15th Ave E store*, https://tinyurl.com/ch3d020t (last visited March 1, 2021).

[28] *Kroger Closing More Stores: Here's Which Seattle Locations Are Shuttering*, https://tinyurl.com/gwe697f4, (last visited March 1, 2021).

---

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION– Page 22 of 24**
*Northwest Grocery Association et al. v. City of Seattle* 2:21-cv-00142

other options to absorb the increased labor costs associated with the Ordinance. Allocating financial burdens across capital, labor, and operational costs in response to a local regulation, however substantial, is not sufficient to demonstrate irreparable harm. *See Sampson*, 415 U.S. 61, 90 (1974). And purely economic harms are not the type of "irreparable injury" necessary to support a preliminary injunction. *See, e.g., Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Because Plaintiffs cannot show irreparable harm in the absence of an injunction, this Court must deny the Motion.

**C. The balance of equities and the public interest favors of the City.**

Plaintiffs' only argument regarding the equities or public interest dimension of their request for a preliminary injunction is that, should the Ordinance later be invalidated, their members would have to individually pursue damages against the City. Mot. at p. 15. Whatever "public" interest is served by prioritizing the convenience of some grocery stores in bringing future lawsuits is dwarfed by the public interest served by leaving the Ordinance in place.

Where the government is a party to motion for preliminary injunction, the balance of the equities and the public interest merge into a single factor. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Indeed "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). The public interest and equities are undeniably served by allowing an ordinance enacted to protect the health, safety, and welfare to ensure minimum wage payment to essential grocery workers to go into effect during the pendency of a public emergency. Exercising its police powers, the City acted to support and protect grocery store employees, critical frontline workers since the start of the pandemic, who are increasingly vulnerable to COVID-19 exposure and continue to provide a crucial service to the community. The Council found that hazard pay would compensate those grocery employees for

OPP. TO MOT. FOR PRELIMINARY
INJUNCTION– Page 23 of 24
*Northwest Grocery Association et al. v. City of Seattle* 2:21-cv-00142

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

the risks they take, permit the employees to access resources they need to stay safe and healthy, improve retention of those workers, and support community access to safe and healthy food, and immediately address a critical public health threat.   Ordinance, Section 1, EE, GG, HH, JJ.   And some grocery stores have embraced the requirements of the Ordinance, voluntarily providing hazard pay to their employees.

The COVID-19 pandemic has forced grocery workers to risk their lives or their loved ones' lives on a daily basis, simply to maintain their livelihoods and supply their communities with food. The overwhelming public interest in providing appropriate compensation to this class of workers vastly outweighs a potential dip in Plaintiffs' members' record profits.

## V.    CONCLUSION

Plaintiffs have not justified their request for the extraordinary remedy they seek.   There is no likelihood that Plaintiffs' claims will succeed on their merits as they are contradicted by nearly a century of settled law; and, in any event, Plaintiffs face only temporary, legally addressable harms.   Further, the balance of equities and the public interest must be strongly in favor of protecting workers and the public.   This Court should reject Plaintiffs' invitation to resuscitate nineteenth century jurisprudence and privilege their private contracts over the City's routine exercise of its power to protect public health, safety, and welfare.   Plaintiffs' Motion should be denied.

**OPP. TO MOT. FOR PRELIMINARY INJUNCTION– Page 24 of 24**
*Northwest Grocery Association et al.  v. City of Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA  98104-7095
(206) 684-8200

1

2  Respectfully submitted this 1st day of March, 2021

3                                    CITY OF SEATTLE

4                                    PETER S. HOLMES
5                                    Seattle City Attorney

6                                    By   ___*s/ Jeremiah Miller*_____

7                                        Jeremiah Miller, WSBA # 40949
8                                        Assistant City Attorney
                                         Phone: 206-256-5495
9                                        Fax:  206-684-8284
10                                       jeremiah.miller@seattle.gov

11                                       Erica Franklin, WSBA #43477
                                         Assistant City Attorney
12                                       Phone:  206-733-9309
                                         Fax:  206-684-8284
13                                       erica.franklin@seattle.gov

14                                       Derrick De Vera, WSBA #49954
15                                       Assistant City Attorney
                                         Phone:  206-386-0083
16                                       Fax:  206-684-8284
                                         derrick.devera@seattle.gov
17

18                                       Seattle City Attorney's Office
                                         701 Fifth Avenue, Suite 2050
19                                       Seattle, WA 98104

20
                                         *Attorneys for Defendant City of Seattle*
21

22

23

24

25

26

---

**OPP. TO MOT. FOR PRELIMINARY
INJUNCTION**
*Northwest Grocery Association et al.  v. City of
Seattle* 2:21-cv-00142

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA  98104-7095
(206) 684-8200

Attachment A

**O**

# United States District Court
# Central District of California

CALIFORNIA GROCERS
ASSOCIATION,

Plaintiff,

v.

CITY OF LONG BEACH,

Defendant.

UNITED FOOD & COMMERCIAL
WORKERS LOCAL 324,

Intervenor.

Case № 2:21-cv-00524-ODW (ASx)

**ORDER DENYING PRELIMINARY
INJUNCTION [18]**

## I.    INTRODUCTION

The COVID-19 pandemic has been awful.  In an effort to avoid illness, permanent health damage, and death, we have lived in a state of quarantine for an entire year and counting.  Meanwhile, certain workers deemed "essential" have continued to work in roles that do not practically permit quarantining from others.  For example, grocery workers have served an essential function by keeping stores open, stocked, and sanitized, despite the perils of working frequently within six feet of the general public.

This case concerns the Premium Pay for Grocery Workers Ordinance ("Ordinance"), recently enacted by Defendant City of Long Beach ("City"), which mandates that all grocery workers in the area must be paid four dollars ($4.00) more than their hourly wage, for a period of at least 120 days.  (*See* Compl. Ex. A ("Ordinance"), ECF No. 2.)  The Ordinance also prohibits employers from reducing compensation or limiting a worker's earning capacity, so employers cannot directly circumvent the Ordinance's effect by lowering the dials on wages or hours.

Plaintiff California Grocers Association ("CGA") brings this action against the City, arguing that the Ordinance is invalid under federal and constitutional law.  (*See* Compl., ECF No. 2.)  Presently before the Court is CGA's request for a preliminary injunction stopping the enforcement of the Ordinance.  (*See* Ex Parte Appl. for Temp. Restraining Order ("Application" or "Appl."), ECF No. 18; Min. Order Denying Appl. ("Min. Order"), ECF No. 22 (denying ex parte application for a TRO but setting hearing to consider a preliminary injunction).)  The preliminary injunction issue has been fully, if not excessively, briefed.  (*See* Appl.; Opp'n to Appl. ("Opp'n"), ECF No. 20; Suppl. Opp'n to Mot. Prelim. Inj. ("Suppl. Opp'n"), ECF No. 24; Reply ISO Mot. Prelim. Inj. ("Reply"), ECF No. 26.)  On February 23, 2021, the Court took the matter under submission after thorough oral arguments. (Minutes, ECF No. 40.)  For the reasons that follow, CGA's motion for a preliminary injunction is **DENIED**.  (ECF No. 18.)

## II.    BACKGROUND

The City enacted the Ordinance on January 19, 2021.  (*See* Compl. ¶ 5.)  The Ordinance "aims to protect and promote the public health, safety, and welfare during the new coronavirus 19 (COVID-19) emergency by requiring grocery stores to provide premium pay for grocery workers performing work in Long Beach."  (Ordinance § 5.91.005.)  It also acknowledges that "[g]rocery workers face magnified risks of catching or spreading the COVID-19 disease because the nature of their work involves close contact with the public, including members of the public who are not showing symptoms of COVID-19 but who can spread the disease."  (*Id.*)  Thus, the Ordinance

contemplates that "premium pay better ensures the retention of these essential workers who are on the frontlines of this pandemic," and that grocery workers "are deserving of fair and equitable compensation for their work." (*Id.*)

In pertinent part, the Ordinance provides:

- "Hiring entities shall provide each grocery worker with premium pay consisting of an additional Four Dollars ($4.00) per hour for each hour worked." (*Id.* § 5.91.050(A).)

- "Hiring entities shall provide the [$4.00 premium pay] for a minimum of one hundred twenty (120) days from the effective date of th[e] Ordinance." (*Id.* § 5.91.050(B); *see also id* § 5.91.050(C) ("Unless extended by City Council, this ordinance shall expire in one hundred twenty (120) days.").)

- "No hiring entity shall, as a result of this Ordinance going into effect . . . [1] Reduce a grocery worker's compensation; [or 2] Limit a grocery worker's earning capacity." (*Id.* § 5.91.060(A).)

- "'Grocery worker' means a worker employed directly by a hiring entity at a grocery store. Grocery worker does not include managers, supervisors[,] or confidential employees." (*Id.* § 5.91.020.)

- "'Grocery store' means a store that devotes seventy percent (70%) or more of its business to retailing a general range of food products, which may be fresh or packaged." (*Id.* § 5.91.020.)

- "'Hiring entity' means a grocery store that employs over three hundred (300) grocery workers nationally and employs more than fifteen (15) employees per grocery store in the City of Long Beach." (*Id.* § 5.91.020.)

- "The provisions of this Ordinance are declared to be separate and severable. If any clause, sentence, paragraph, subdivision, section, subsection, or portion . . . , or the application thereof . . . is held to be invalid, it shall not affect the validity of the remainder of this Ordinance, or the validity of its application to other persons or circumstances." (*Id.* § 5.91.150.)

The day after the Ordinance was enacted, CGA brought this action "on behalf of its members who are grocery store employers." (Compl. ¶ 12.) CGA's members "operate grocery stores in the City that employ members of a specific labor union, United Commercial Food Workers International, Local 324 ('UCFW 324'), and those employees are parties to collective bargaining agreements that govern the terms of their employment, including wage scales."[1] (Compl. ¶ 13.) Now, CGA seeks a preliminary injunction to enjoin enforcement of the Ordinance. (*See* Appl.; Reply.)

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also* Fed. R. Civ. P. 65 (governing the issuance of preliminary injunctions). "An injunction is an exercise of a court's equitable authority," which should not be invoked as a matter of course, but "only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).

To obtain a preliminary injunction, the moving party must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party's favor; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

## IV. DISCUSSION

A preliminary injunction is not warranted because CGA fails to establish a likelihood of success on the merits. CGA asserts five causes of action, each for declaratory and injunctive relief against enforcement of the Ordinance, based on: (1) NLRA preemption, (2) the Equal Protection Clause of the U.S. Constitution, (3) the

---

[1] UCFW 324 sponsored the Ordinance's passing, and the parties have stipulated for UCFW 324 to intervene as a Defendant in this action, notwithstanding the present motion for preliminary injunction between CGA and the City. (*Id.* ¶ 16; *see* Order Granting Mot. to Intervene, ECF No. 36.)

Equal Protection Clause of the California Constitution, (4) the Contracts Clause of the U.S. Constitution, and (5) the Contracts Clause of the California Constitution, respectively. (*See* Compl.)

### A. NLRA Preemption (First Cause of Action)

First, the Court considers whether CGA has established a likelihood of success on its preemption claim, whereby it alleges the Ordinance is preempted by the National Labor Relations Act, 29 U.S.C. §§ 151–69 ("NLRA"). (*See* Compl. ¶¶ 22–30.)

"The NLRA—the federal architecture that governs relations between labor and management, for example, union organizing, collective bargaining, and conduct of labor disputes—has no express preemption provision." *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016) [hereinafter *AHLA*] (citing 29 U.S.C. §§ 151–69; *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008)). "Nonetheless, the Supreme Court has recognized two implicit preemption mandates: *Garmon* preemption and *Machinists* preemption." *Id.* (citing *Brown*, 554 U.S. at 65). In this case, CGA relies solely on a theory of *Machinists* preemption, which "prohibits states from restricting a 'weapon of self-help,' such as a strike or lock-out." *AHLA*, 834 F.3d at 963 (quoting *Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp't Rels. Comm'n*, 427 U.S. 132, 146 (1976) [*Machinists*]). The policy underlying the *Machinists* preemption is that "Congress left these self-help tools unregulated to allow tactical bargaining decisions 'to be controlled by the free play of economic forces.'" *Id.* (quoting *Machinists*, 427 U.S. at 140).

Generally, "the NLRA is concerned with ensuring an equitable *bargaining process*, not with the substantive terms that may emerge from such bargaining." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 20 (1987) (emphasis added) (citing *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754 (1985)). "Thus, the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption . . . ." *Id.* at 21 (citing *Malone v. White Motor Corp.*, 435 U.S. 497, 504–05 (1978)) (rejecting preemption argument for statute requiring a

severance payment for employees who lacked express severance contracts); *see also Metro. Life Ins.*, 471 U.S. at 754 (rejecting preemption argument for law requiring minimum mental health care benefits under insurance policies and employee healthcare plans); *AHLA*, 834 F.3d at 963–66 (rejecting preemption argument for ordinance setting higher minimum wage and paid leave requirements for hotel workers). Indeed, this "general principle that governments can pass minimum labor standards pursuant to their police power without running afoul" of the NLRA is well established. *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1187 (C.D. Cal. 2015), *aff'd*, *AHLA*, 834 F.3d at 958.

However, "in extreme cases, substantive requirements *could* be so restrictive as to virtually dictate the results of the collective bargaining and self-organizing process," in which case the *Machinists* preemption may apply. *Id.* (emphasis added) (internal quotation marks and brackets omitted) (quoting *Chamber of Com. of U.S. v. Bragdon*, 64 F.3d 497, 501 (9th Cir. 1995)). "The question then becomes the extent of the substantive requirements that a state may impose on the bargaining process." *Bragdon*, 64 F.3d at 501–02 (finding ordinance preempted where it "affect[ed] the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and *Fort Halifax*"). In other words, "state action that intrudes on the *mechanics* of collective bargaining is preempted, but state action that sets the stage for such bargaining is not." *AHLA*, 834 F.3d at 964–65 (holding minimum labor standards not preempted where they "alter[ed] the backdrop of negotiations, not the mechanics of collective bargaining").

Here, CGA argues that the Ordinance unlawfully alters the mechanics of collective bargaining, notwithstanding the fact that minimum labor standards are generally not preempted by the NLRA. As articulated by CGA:

> [T]he Ordinance requires a very specific increase ($4/hour) in the baseline hourly wage, while *outlawing any other modification that could reduce the employee's compensation or earning potential* in any way. . . . [T]his provision effectively ties the employers' hands, rendering it impossible for

employers to bargain with whatever tools she has available. It also implies employers must accept whatever business consequences may flow from an immediate 20–30% increase in labor costs, as reductions in hours, shifts, or workforce are illegal.

(Appl. 7; *see also* Compl. ¶ 15.)

In opposition, the City maintains that "[t]he Ordinance is [merely] a substantive labor standard benefiting union and non-union grocery workers as individuals." (Suppl. Opp'n 23 (emphasis removed).) The City also points out that the Ordinance "does not prevent an employer from taking *any* action (e.g., termination, reduction in hours) *as long as it is not a response to the Ordinance*." (*Id.* at 12 (second emphasis added).)

Problematically, though, the City's briefs simply do not address the prohibition's scope regarding actions that *are* taken as a result of the Ordinance. (Suppl. Opp'n 23–28 (assuming without discussion that the Ordinance "does not conflict in any way with the NLRA").) This poses somewhat of a barrier to resolution, as the issue of preemption ultimately turns on what it means to "[r]educe a grocery worker's compensation" or "[l]imit a grocery worker's earning capacity," as prohibited by the Ordinance. (*See* Ordinance § 5.91.060(A).) If the Ordinance really does prohibit *any* collective bargaining by grocers to mitigate increased labor costs that result from the Ordinance, then CGA's position is fairly compelling. For although numerous substantive labor standards have been found not preempted by the NLRA, those cases would all be distinguishable from the present action.

In cases like *Metropolitan Life*, *Fort Halifax*, and *AHLA*, the laws in question were upheld largely *because* they merely provided a "backdrop" for negotiation. *See Metro. Life Ins.*, 471 U.S. at 757; *Ford Halifax*, 482 U.S. at 21; *AHLA*, 834 F.3d at 965. The laws at issue in those cases altered the starting points for negotiations but left the parties *free to negotiate with those new starting points in mind*. CGA argues that the Ordinance is different in that it *prohibits* using the mandated premium pay as a backdrop to negotiation because employers cannot reduce compensation or earning potential, *in any way*, to account for the mandatory $4/hour bonus pay. Indeed, if CGA's

interpretation of the Ordinance is correct, it would seem that this Ordinance "affects the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and *Fort Halifax*." *See Bragdon*, 64 F.3d at 502.

Critically, however, CGA has not established a likelihood that its interpretation is, in fact, correct. If the drafters of the Ordinance meant to prohibit employers from offsetting labor costs by lowering any form of compensation "in any way" as CGA suggests, they could have said so in the Ordinance. They did not. Instead, the Ordinance prohibits (1) reducing a worker's wages to offset that worker's premium pay, and (2) reducing a worker's hours to offset the increase in that worker's effective hourly pay. (*See* Ordinance § 5.91.060(A).) Even if the Ordinance does mean something beyond what it says, CGA simply has not shown a likelihood that this is so.

Indeed, the only evidence offered by CGA to support its interpretation is not convincing. CGA merely submits self-serving declaration testimony that at least one of its members "*no longer has the ability to* [1] reject UCFW's premium pay proposal for [its] Long Beach store associates or [2] *bargain a reduction in costs elsewhere in their CBA*." (Decl. of Leroy D. Westmoreland ¶ 8, ECF No. 18-2 (emphasis added).) As to the first part, the Court has already explained why the inability to reject a particular union demand is insufficient to establish preemption. (*See supra*, at 5–6; *see also, e.g.*, *Fort Halifax*, 482 U.S. at 20 (rejecting argument that a state law "intrude[d] on the bargaining activities of the parties because the prospect of a statutory obligation undercuts an employer's ability to withstand a union's demand for severance pay"). As for the remainder, emphasized in the quote above, this self-serving and entirely conclusory testimony does not, on its own, establish the likelihood that the Ordinance truly has this effect.

Moreover, even if section 5.91.060 *could* be interpreted as restricting all facets of a collective bargaining agreement, thereby resulting in preemption, CGA fails to explain why that particular application of section 5.91.060 could not be severed, thereby

leaving the remainder of the Ordinance intact. The Ordinance includes a clear severability provision. (*See* Ordinance § 5.91.150.) "If any clause, sentence, paragraph, subdivision, section, subsection, or portion . . . , *or the application thereof* . . . is held to be invalid, *it shall not affect* the validity of the remainder of this Ordinance, or *the validity of its application to other persons or circumstances*." (*Id.* (emphases added).) Thus, even if section 5.91.060 could be applied in a manner that is preempted by the NLRA, only *that application* of section 5.91.060 would be invalid. By the Ordinance's own terms, *that* preemption "shall not affect . . . the validity of [section 5.91.060's] application to other persons or circumstances." (*Id.*) The Ordinance would still require a $4 premium pay for grocery workers, and it would still prohibit reducing a grocery worker's base compensation or total hours as a result of the Ordinance.

In short, CGA asserts a theory of preemption that would perhaps be plausible, if the Ordinance was drafted differently. However, CGA fails to establish a likelihood that this Ordinance is, in fact, so preempted. Thus, CGA fails to show a likelihood of success on its first cause of action.

## B. Equal Protection (Second and Third Causes of Action)

Next, the Court considers whether CGA establishes a likelihood of success on its second and third claims, which are asserted under the Equal Protection Clauses of the U.S. and California Constitutions. (*See* Compl. ¶¶ 31–40.) The Court focuses primarily on the federal standard, as "[t]he equal protection analysis under the California Constitution is substantially similar to analysis under the federal Equal Protection Clause." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004).

"The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). "But so too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Id.* (internal quotation marks and brackets omitted) (quoting

*Tigner v. Texas*, 310 U.S. 141, 147 (1940)). "Laws alleged to violate the equal protection clause are generally subject to one of three levels of 'scrutiny' by courts: strict scrutiny, intermediate scrutiny, or rational basis review." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004). Strict scrutiny applies to laws that "discriminate against a suspect class, such as a racial group, or when they discriminate based on any classification but impact a fundamental right, such as the right to vote." *Id.* (citations omitted). Intermediate scrutiny applies to laws that "discriminate based on certain other suspect classifications, such as gender." *Id.* "All other laws are subject to rational basis review." *Id.* (citing *Fitzgerald v. Racing Ass'n*, 539 U.S. 103, 106–07 (2003)).

Applying this standard to wage laws that target certain classifications of individuals, "[s]ocial and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose." *Hodel v. Indiana*, 452 U.S. 314, 331 (1981); *accord Long Beach City Emps. Ass'n v. City of Long Beach*, 41 Cal. 3d 937, 948 (1986). But when a state or locality's classifications "disadvantage a 'suspect class'" or "impinge upon the exercise of a 'fundamental right,'" "it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Plyler*, 457 U.S. at 216–17.

Here, CGA contends the Ordinance's classification is subject to strict scrutiny because the Ordinance impinges on a fundamental right otherwise guaranteed by the Contract Clause. (Appl. 8–10.) CGA also argues the classification would fail under a rational basis review. (*Id.* at 11.) In response, the City represents, "[M]ore decisions than can be cited . . . have, without difficulty, concluded that economic and employment related regulations like the Ordinance involve no fundamental right or suspect class and so are analyzed under the deferential rational basis test." (*Id.* (citing, among others,

*Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 407 (9th Cir. 2015); *RUI One Corp*, 371 F.3d at 1154).)

While it is true that myriad cases have applied the rational basis standard when analyzing equal protection challenges against economic legislation, CGA accurately notes that none appear to have squarely addressed the issue presented here. Indeed, whether strict scrutiny applies to a classification that allegedly violates the Equal Protection Clause, *because the underlying law allegedly violates the Contract Clause*, appears to be a novel question. Although it seems implausible that this position is truly unprecedented, neither party cites any authority showing otherwise, nor has the Court uncovered any such case.

Regardless, in this case, CGA fails to convincingly establish why the Ordinance's classification should be subject to strict scrutiny. The Court reaches this determination for a number of reasons. To begin with, the parties do not dispute that "[t]he power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power." *RUI One Corp.*, 371 F.3d at 1150 (quoting *Metro. Life Ins.*, 424 U.S. at 356 ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.")). When that is the case, "[t]he standard for evaluating ordinances claimed to be violative of due process or equal protection is whether a *rational basis* exists for the police power exercised or classification established by the ordinance." *Autotronic Sys., Inc. v. City of Coeur D'Alene*, 527 F.2d 106, 108 (9th Cir. 1975) (emphasis added).

Furthermore, alleged Contract Clause violations committed in the exercise of a municipality's police power are subject to analysis under their own separate framework, which does *not* automatically assume that strict scrutiny applies. *See Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978)) ("The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected."). Rather, where an exercise of the police power is found to "operate[] as a substantial

11

impairment of a contractual relationship," the law itself is only subject to strict scrutiny when the nature of the impairment is the most severe. *Id.* Yet CGA suggests that anytime the same law identifies any classification of individuals, the *classification* should be subject to strict scrutiny. The Court seriously hesitates to apply such incongruent standards.

Finally, the mere fact that the Contract Clause appears in the Constitution does not render it a "fundamental right" for equal protection purposes. It is well-established that "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Id.* at 410 (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934) ("The question is . . . whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end.")). Because "it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States," *Allied Structural Steel*, 438 U.S. at 241, the Court rejects CGA's argument that the Ordinance's classification must be analyzed under strict scrutiny simply because the clause is found in the Constitution. *See generally Raycom Nat'l, Inc. v. Campbell*, 361 F. Supp. 2d 679, 686–87 (N.D. Ohio) ("Because th[e] right of access is limited and not absolute, the court concludes that it is not explicitly or implicitly guaranteed by the Constitution and thus not a fundamental right.").

Applying, therefore, a rational basis review, the classification set forth in the Ordinance must be afforded "a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (internal quotation marks and citations omitted). Here, the classification at issue includes employers with at least 300 employees nationwide and at least fifteen employees per grocery store in Long Beach, whose stores devote at least 70% of their business to retailing food products (i.e., groceries). (Ordinance § 5.91.020.) In other

words, the Ordinance targets large grocery stores, and CGA insists this classification does not have "any relationship" to any of the Ordinance's stated purposes. (Appl. 11.)

The City advances a theory that large grocery stores have reaped significant profits during the pandemic while their employees' wages have remained more or less the same, despite the increased risk of exposure to COVID-19 that grocery workers face. (*See* Suppl. Opp'n 7.) To support this theory, the City submits various news articles reporting on this exact phenomenon, as well as press releases issued by one of CGA's own members regarding its Second Quarter 2020 and Third Quarter 2020 results. (Decl. of Daniel L. Richards ("Richards Decl.") ¶¶ 18–21, ECF No. 21; *see id.* Exs. Q–T, ECF Nos. 21-17, 21-18, 21-19, 21-20.) Notably, those press releases issued by CGA's member (a large grocery store) indicate that "sales grew" by 13.9% in the second quarter and 11.3% in the third quarter of 2020. (*See id.* Exs. S, T.) These facts present a conceivable, rational basis for the classification in question. *See Int'l Franchise Ass'n*, 803 F.3d at 407 ("It is legitimate and rational for the City to set a minimum wage based on economic factors, such as the ability of employers to pay those wages.").

CGA's efforts to debunk this possible rationale fall short. CGA submits its own evidence to suggest that grocery stores have struggled financially since the Ordinance was passed. (*See* Decl. of Brad Williams ("Williams Decl.") ¶ 7, Ex. C, ECF No. 26-2.) Even accepting this as true, it does not make the lawmakers' decision any less rational because at the time the Ordinance was enacted, this fact did not exist. CGA also argues that "[t]he most recently released [data] . . . suggests that California retail workers have *only a mildly elevated mortality risk* relative to the general population." (Reply 19 n.4 (emphasis added) (citing Decl. of William F. Tarantino ¶¶ 2–3, Exs. A–B, ECF No. 26-7).) This is not convincing either, as a mildly elevated mortality risk is *still* an elevated mortality risk, and the City could have rationally decided to compensate grocery workers for taking on such risk by showing up for work. Moreover, "a legislative choice is not subject to courtroom fact-finding and may be based on rational

speculation unsupported by evidence or empirical data." *RUI One Corp.*, 371 F.3d at 1155 (quoting *Beach Commc'ns*, 508 U.S. at 315). Indeed, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.*

Finally, to the extent that CGA complains of lawmakers' decision to target large grocery stores as opposed to all grocery stores or all essential retail businesses, (*see* Appl. 7, 12–13; Reply 15–17), "[s]uch legislative decisions are 'virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally,'" *RUI One Corp.*, 371 F.3d at 1155 (quoting *Beach Commc'ns*, 508 U.S. at 316 ("The legislature may select one phase of one field and apply a remedy there, neglecting the others.")).

"Whether the legislation is wise or unwise as a matter of policy is a question with which [the Court is] not concerned." *Blaisdell*, 290 U.S. at 447–48. Rather, the Court's "role is at an end once [it] can say that the view chosen by the City council is not irrational." *Autotronic Sys.*, 527 F.2d at 108. Here, the Court finds a rational basis does exist for the Ordinance's classification. Thus, CGA fails to show a likelihood of success on its Equal Protection Clause claims.

## C.    Contracts Clause (Fourth and Fifth Causes of Action)

Finally, the Court considers whether CGA has established a likelihood of success on its Contract Clause claims. (*See* Compl. ¶¶ 41–47.) Again, the Court focuses on the federal standard, as "[t]he California Supreme Court uses the federal Contract Clause analysis for determining whether a statute violates the parallel provision of the California Constitution." *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1097 (9th Cir. 2003) (citing *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805 (1989)).

As already mentioned, the Contract Clause "does not prevent the [city] from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected." *Allied Structural Steel*, 438 U.S. at 241

(quoting *Manigault v. Springs*, 199 U.S. 478, 480 (1905)).  The Supreme Court has also noted, though, that "[i]f the Contract Clause is to retain any meaning at all . . . it must be understood to impose *some* limits upon the power of a [city] to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Id.* (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22 (1977) ("Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.").

Thus, the Supreme Court has established a three-step test for determining whether the Contract Clause has been violated by an otherwise valid exercise of police power. First, "[t]he threshold inquiry is 'whether the [city] law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Rsrvs. Grp.*, 459 U.S. at 411 (quoting *Allied Structural Steel*, 438 U.S. at 244).  "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Id.* (citing *Allied Structural Steel*, 438 U.S. at 245). "Total destruction of contractual expectations is not necessary for a finding of substantial impairment." *Id.* (citing *U.S. Trust Co.*, 431 U.S. at 26–27).  "On the other hand, [city] regulation that restricts a party to gains it reasonably expected from a contract does not necessarily constitute a substantial impairment."  *Id.* (citing *U.S. Trust Co.*, 431 U.S. at 31). Furthermore, when applicable, courts must "consider whether the industry the complaining party has entered has been regulated in the past."  *Id.* (citing *Allied Structural Steel*, 438 U.S. at 242 n.13).

Second, "[i]f the [city] regulation constitutes a substantial impairment, the [city], in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Id.* (internal citations omitted).  Although it may, "the public purpose need not be addressed to an emergency or temporary situation."  *Id.*  The principle underlying this step is to "guarantee[] that the [city] is exercising its police power, rather than providing a benefit to special interests."  *Id.*

Third, "[o]nce a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* (internal quotation marks and brackets omitted). "Unless the [city] itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* (internal quotation marks, citations, and alterations omitted) (quoting *U.S. Trust Co.*, 431 U.S. at 22–23).

Here, CGA fails to establish a likelihood of success on its Contract Clause claims. To start, CGA fails to identify any terms of the allegedly impaired contracts. The Court cannot determine whether the Ordinance "substantially impairs" the contractual relationships between CGA's members and their workers without knowing the nature of those relationships. Similarly, the Court cannot determine what level of scrutiny to apply in analyzing the Ordinance if it cannot determine the severity of the alleged impairment.

Moreover, CGA *does not assert* a likelihood of success on its Contract Clause claims. Instead, CGA tries to shoehorn a Contract Clause analysis into its Equal Protection Clause analysis. (*See* Appl. 7–13 (discussing Contract Clause issues but limiting conclusion to likelihood of success on Equal Protection claims); Reply 8–17 (same).) By mashing the two analyses together, CGA distorts the Equal Protection Clause framework in an attempt to impose strict scrutiny on the Ordinance in the Contract Clause context. (*See* Part IV(B), *supra*.) However, these are two separate inquiries, and CGA fails to establish a likelihood of success on either.

Even if, *arguendo*, the Ordinance does substantially impair the contractual relationships between CGA's members and the City, CGA fails to establish a likelihood that the Ordinance would not survive the second and third steps of the analysis. In fact, CGA skips the second step altogether regarding the *existence* of a legitimate purpose, instead arguing only that the identifiable purposes are not advanced by the Ordinance.

(*See* Appl. 11–12.)  With respect to the third step, CGA argues that the Ordinance "does not protect or promote public health" because "a wage bump does not mitigate the risks of exposure to a virus."  (*Id.* at 11.)  Indeed, this is a fair point, and the Court is inclined to agree.  That does CGA little good, however, because CGA utterly fails to address why the Ordinance is not an appropriate means for achieving its other stated purposes (e.g., fairly compensating grocery workers for the hazards they encounter as essential workers).

The Court's decision today is limited.  It does not purport to reach whether the Ordinance violates the Contract Clause.  Perhaps an argument could be made that it does.  What matters for now is that CGA has not shown a likelihood that this is the case.

## V.    CONCLUSION

In summary, CGA fails to establish a likelihood of success on any of its claims. Thus, the Court need not consider the remaining *Winter* factors.  CGA's motion for a preliminary injunction is **DENIED**.  (ECF No. 18.)

**IT IS SO ORDERED.**

February 25, 2021

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

17