THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

NORTHWEST GROCERY
    ASSOCIATION, *et al.*,

                        Plaintiffs,

            v.

CITY OF SEATTLE,

                        Defendant.

CASE NO. C21-0142-JCC

ORDER

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction (Dkt. No. 10) and Defendant's motion to dismiss (Dkt. No. 23). Having thoroughly considered the parties' briefing, oral arguments, and the relevant record, the Court hereby GRANTS Defendant's motion to dismiss and DENIES Plaintiffs' motion for a preliminary injunction for the reasons explained herein.

I.    **BACKGROUND**

On January 25, 2021, in response to concerns for the health and welfare of grocery employees, the Seattle City Council unanimously passed the Hazard Pay for Grocery Employees Ordinance ("Ordinance"). (Dkt No. 1 at 2.) The Ordinance "establish[es] labor standards requirements for additional compensation for grocery employees working in Seattle," Ordinance,

Preamble,[1] and mandates that covered grocery store employers in the City provide "additional compensation" of four dollars per hour to covered employees as "hazard pay."[2] Ordinance §§ 100.010, 100.025. The Ordinance applies to "grocery businesses that employ 500 or more employees worldwide regardless of where those employees are employed." Ordinance § 100.020. "Grocery business" includes any retail store operating in Seattle that is either (1) "[o]ver 10,000 square feet in size and that is primarily engaged in retailing groceries for offsite consumption" or (2) "[o]ver 85,000 square feet and with 30 percent or more of its sales floor area dedicated to sale of groceries[.]" Ordinance § 100.010. The hazard pay requirements are structured as temporary measures which remain in effect "for the duration of the civil emergency proclaimed by the Mayor on March 3, 2020." Ordinance § 100.025(C). Finally, the Ordinance prohibits employers from circumventing its effect by reducing wages to counteract the hazard pay increase, providing the following limitation:

> No employer shall, as a result of this ordinance going into effect, take steps to reduce employee compensation so as to prevent, in whole or in part, employees from receiving hazard pay at a rate of four dollars per hour for each hour worked in Seattle in addition to those employees' other compensation. Employers shall maintain records to establish the reason(s) for any reduction in employee compensation pursuant to Section 100.040.

Ordinance § 100.025.A.1.

On February 3, 2021, the day the Ordinance took effect, Plaintiffs Northwest Grocery Association ("NWGA") and Washington Food Industry Association ("WFIA") brought this action against Defendant City of Seattle ("City"), seeking declaratory and injunctive relief against enforcement of the Ordinance. (Dkt. No. 1 at 3.) Plaintiffs argue the Ordinance is invalid,

---

[1] Plaintiffs attached a copy of the Ordinance to their Complaint, (Dkt. No. 1 at 14–49), refer to it throughout, (*see, e.g.*, Dkt. No. 1 at 2, 6), and neither party has questioned its authenticity. Accordingly, the Court takes judicial notice of the Ordinance attached to the Complaint.

[2] Employers already providing hazard pay on the effective date of the Ordinance "may use the hourly rate of that hazard pay to offset the amount due under this subsection." Ordinance § 100.025.A.2.

alleging that it is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151–169, and that it violates the Equal Protection and Contracts Clauses of the federal and state constitutions.

## II.   DISCUSSION

### A.  Legal Standard for a Motion to Dismiss

A defendant may move to dismiss when plaintiffs "fail[] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). A claim has facial plausibility when plaintiffs plead factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. Although the court must accept as true a complaint's well-pleaded facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion. *Vasquez v. Los Angeles Cnty*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Plaintiffs are obligated to provide grounds for their entitlement to relief that amount to more than labels and conclusions or a formulaic recitation of the elements of a cause of action, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), and "[d]ismissal can be based on the lack of a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

### B.  Defendant's Motion to Dismiss

Plaintiffs argue the Ordinance is unlawful and seek declaratory and injunctive relief preventing its enforcement, alleging violations based on (1) NLRA preemption, (2) the Equal Protection Clause of the U.S. Constitution, (3) the Equal Protection Clause of the Washington Constitution, (4) the Contracts Clause of the U.S. Constitution, and (5) the Contracts Clause of the Washington Constitution. (Dkt. No. 1.) For the reasons described below, the Court concludes

1    that none of these arguments establish valid claims for relief and Plaintiff's complaint must be

2    dismissed under Rule 12(b)(6).

3                    1.   Ordinance Is Not Preempted by the National Labor Relations Act

4            Plaintiffs assert that the Ordinance is invalid because it is preempted by the NLRA. (Dkt.

5    No. 1 at 7–8.) The Supremacy Clause of the U.S. Constitution provides that the laws of the U.S.

6    are "the supreme law of the land." U.S. Const. art. VI, cl. 2. Consequently, Congress may "pre-

7    empt, *i.e.*, invalidate, a state law through federal legislation,"[3] and it may do so expressly or

8    implicitly. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). The NLRA contains no express

9    preemption provision, but the Supreme Court has recognized that the NLRA "implicitly

10   mandated two types of pre-emption as necessary to implement federal labor policy." *Chamber of

11   Com. of U.S. v. Brown*, 554 U.S. 60, 65 (2008). Plaintiffs' argument relies on one of these

12   implicit preemption doctrines: *Machinists* preemption.[4] *See Int'l Ass'n of Machinists v. Wis.

13   Emp. Rels. Comm'n*, 427 U.S. 132 (1976). *Machinists* preemption prevents states from regulating

14   where "Congress intended that the conduct involved be unregulated because [it should be] left

15   'to be controlled by the free play of economic forces.'" *Id.* at 140 (1976) (quoting *NLRB v. Nash-

16   Finch Co.*, 404 U.S. 138, 144 (1971)). Specifically, this strain of preemption precludes states

17   from imposing restrictions on the use of "economic weapons" of "self-help" permitted by federal

18   law, such as strikes and lockouts. *Id.* at 147.

19           While neither the text nor the legislative history of the NLRA directly speak to whether

20

21           [3] Seattle is a "home rule" jurisdiction, with "as broad legislative powers as the state,
     except when restricted by enactments of the state legislature." *Winkenwerder v. City of Yakima*,
22   328 P.2d 873, 878 (Wash. 1958). Accordingly, the Court scrutinizes its ordinances under the
     same framework as it would state law. *See, e.g.*, *RUI One Corp. v. City of Berkeley*, 371 F.3d
23   1137, 1147 (9th Cir. 2004).

24           [4] The other type of preemption, not at issue here, is known as *Garmon* preemption, and it
     prohibits states from regulating or prohibiting conduct arguably subject to the regulatory
25   jurisdiction of the NLRB. *See Chamber of Com. of the U.S. of Am. v. City of Seattle*, 890 F.3d
     769, 790 (9th Cir. 2018) (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236
26   (1959)).

Congress intended it to reach state regulations of general applicability affecting the terms over

which parties may bargain, the law "is primarily concerned with establishing an equitable

process for determining terms and conditions of employment, and *not* with particular substantive

terms of the bargain that is struck." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 753

(1985) (emphasis added). As a result, the Supreme Court has held the NLRA does not preempt

"minimum labor standards" which do not affect the process of collective bargaining, but rather

set the minimum terms that form the backdrop of their bargaining process. *Id.* at 756 ("[T]here is

no suggestion . . . that Congress intended to disturb the myriad state laws then in existence that

set minimum labor standards, but were unrelated in any way to the processes of bargaining or

self-organization."). Such standards "affect union and nonunion employees equally, and neither

encourage nor discourage the collective-bargaining processes that are the subject of the NLRA."

*Id.* at 755. The mere fact that a state law *affects*—and in effect, grants to employees—something

for which they otherwise could have bargained does not give rise to NLRA preemption. *Fort*

*Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987).

      Courts engaging in preemption analysis under *Machinists* have repeatedly found that

ordinances affecting the terms over which parties might bargain—rather than the mechanics of

the underlying bargaining process—are not preempted. *See, e.g.*, *Am. Hotel and Lodging Assoc.*

*v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016) (living wage ordinance mandating

higher minimum wage and paid time off for airport workers was not preempted); *Metro. Life Ins.*

*Co.*, 471 U.S. at 755 (state law mandating minimum health benefits was not preempted); *Nat'l*

*Broad. Co. v. Bradshaw*, 70 F.3d 69, 71 (9th Cir. 1995) (state law mandating premium overtime

wage rates for broadcast industry employees was not preempted); *Babler Bros. v. Roberts*, 995

F.2d 911 (9th Cir. 1993) (state law mandating premium overtime wages for non-union

employees working on public construction projects was not preempted). "Indeed, this 'general

principle that governments can pass minimum labor standards pursuant to their police power

without running afoul' of the NLRA is well established." *Cal. Grocers Ass'n v. City of Long*

*Beach*, 2021 WL 736627, slip op. at 3 (C.D. Cal. Feb. 25, 2021) (quoting *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1187 (C.D. Cal. 2015), *aff'd*, 834 F.3d 958 (9th Cir. 2016)).

In *Fort Halifax Packing Co.*, the Supreme Court considered whether the NLRA preempted a Maine law which required employers with more than 100 employees to provide a one-time, lump sum severance payment to all employees affected by a plant closure or relocation. 482 U.S. at 3–4. As in the present case, the law applied to union and non-union workers alike, but contained an exception for employees "covered by an express contract providing for severance pay." *Id.* at 4 n.1. The employer conceded that, unlike the law preempted in *Machinists*, the Maine law did not directly prohibit employers or employees from utilizing the sorts of economic weapons of self-help. *Id.* at 20. Nonetheless, the employer argued the law "intrude[d] on the bargaining activities of the parties because the prospect of a statutory obligation undercut[] an employer's ability to withstand a union's demand for severance pay." *Id.* The Court disagreed, holding that the law was a minimum labor standard that was not preempted by the NLRA. *Id.* at 20–23. The Court pointed out the NLRA "is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining," *id.* at 20, and because it applied to union and non-union employees alike, neither encouraged nor discouraged use of the collective bargaining process, *id.* at 21. The Court cautioned that, because the establishment of minimum labor standards is squarely within the traditional state police power, and "Congress developed . . . the NLRA within the larger body of state law promoting public health and safety," "pre-emption should not be lightly inferred in this area." *Id.* at 21, 22. Plaintiffs do not meaningfully argue why the result reached in *Fort Halifax* should be different than the one here.

The lone case Plaintiffs cite for the proposition that *Machinists* preemption may apply to a wage ordinance is *Chamber of Com. v. Bragdon*. 64 F.3d 497, 502 (9th Cir. 1995). (Dkt. Nos. 10 at 12–13, 28 at 12–13.) In *Bragdon*, the county adopted a prevailing wage ordinance that

dictated the *precise* wage and benefits package paid to all workers on private construction projects above a certain value. 64 F.3d at 502. The package was calculated by averaging the collectively-bargained-for wages and benefits packages of other employers and employees. *Id.* at 502–03. The court held that ordinance "affect[ed] the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and *Fort Halifax.*" *Id.* at 502. Plaintiffs argue this Ordinance is analogous to the ordinance in *Bragdon*, because both "restricted an employer's eligibility to negotiate compensation packages." (Dkt. No. 27 at 10.) But in *Bragdon*, the determinative issue was that the ordinance dictated the mix *entirely*, leaving *nothing* to bargain over. 64 F.3d at 502. The Ordinance here simply *affects* the mix of wage and non-wage benefits offered by employers. This is not sufficient to establish an NLRA preemption argument, as it is true of *any* minimum labor standard. *See Am. Hotel & Lodging Ass'n*, 834 F.3d at 963.

The challenged Ordinance establishes a mandatory wage premium applicable to all covered employees, regardless of whether they are subject to a collective bargaining agreement.[5] *See* Ordinance § 100.025. The fact that the benefit applies across wage levels may indeed distinguish it from a minimum wage law, *but not from a minimum benefit law*, as was upheld in *Metropolitan Life*. Further, like the Maine law in *Fort Halifax*, the Ordinance mandates that covered employers pay a premium to all covered workers—here, workers engaged in specifically delimited types of hazardous work who have been disproportionately impacted by COVID-19—and the premium is applied regardless of their current wage.

Plaintiffs also claim that the Ordinance prohibits any modification that could reduce an employee's compensation in any way, and that, "[l]ike the complex wage and benefit formula in *Bragdon*, this provision effectively ties the employers' hands, rendering it impossible for

---

[5] Plaintiffs argue the Ordinance "has disparate impacts on union and non-union workers." (Dkt. No. 10 at 13.) But there is simply no support for such a proposition in the text of the Ordinance.

1    employers to bargain with whatever tools she has available." (Dkt. No. 10 at 13; *see* Dkt. No. 28

2    at 11–12.) But while Plaintiffs frame the Ordinance's definition of "compensation"[6] as including

3    "the full landscape of terms that are the subject of collective bargaining," the Court does not read

4    it so broadly: nothing regarding benefits, workplace policies or conditions, or hours worked are

5    mentioned in the Ordinance's definition. Ordinance § 100.010. While the Ordinance does

6    prohibit reductions in compensation "as a result of this ordinance going into effect," it does not

7    prohibit bargaining between employers and employees over any other terms.[7] Ordinance

8    § 100.025.A.1. Even on the specific question of compensation, the City points out that the

9    Ordinance "clearly contemplates that pay could be reduced for other reasons," as it includes

10   recordkeeping requirements to justify decreases made for such reasons. (Dkt. No. 23 at 9 n.3

11   (citing Ordinance § 100.025.A.1).) Further, even if the Ordinance did prohibit employers from

12   reducing wages for any reason, it is not clear that would be distinguishable from the function of

13   traditional minimum wage laws, which are consistently upheld. *See, e.g.*, *Am. Hotel and Lodging*

14   *Assoc.*, 834 F.3d at 963.

15       Because the Ordinance does not interfere with the mechanics of the collective bargaining

16

17       [6] The Ordinance defines "compensation" as follows:

18           "Compensation" means the payment owed to an employee by reason of
             employment, including but not limited to, salaries, wages, tips, service charge

19           distributions, overtime, commissions, piece rate, bonuses, rest breaks,
             promised or legislatively required pay or paid leave, and reimbursement for

20           employer expenses.

21   Ordinance § 100.010.

22       [7] In support of the proposition that the Ordinance may wholly dictate the terms of
     collective bargaining, Plaintiffs cite to a recent case where a court denied a preliminary

23   injunction for a similar ordinance, but expressed concern for the plaintiffs' argument that the
     ordinance at issue *could* prohibit any bargaining over compensation terms. (Dkt. No. 28 at 11

24   n.1) (discussing *Cal. Grocers Ass'n*, 2021 WL 736627). However, the ordinance at issue in that
     case was broader: in addition to prohibiting reductions in compensation as a result of the

25   ordinance (as in the instant case), it *also* prohibited grocers from taking actions which "limit a
     grocery worker's earning capacity," and notwithstanding that greater breadth, the court held that

26   plaintiffs "ha[d] not established a likelihood that its interpretation [wa]s, in fact, correct." *Id.* at 4.

process, it is a minimum labor standard of general applicability. As such, it is not preempted by the NLRA.

>  2. <u>Equal Protection Claims are Subject to—and Survive—Rational Basis Review</u>

Plaintiffs next argue the Ordinance violates the Equal Protection Clauses of the U.S. and Washington constitutions because it irrationally singles out their largest members[8] for discriminatory treatment. (Dkt. Nos. 1 at 9, 10 at 13–14, 28 at 21–25.) They further argue the Ordinance is subject to strict scrutiny analysis because it impinges on their "fundamental rights secured by the state and federal Contracts Clauses." (Dkt. Nos. 10 at 14, 28 at 21–25.)

The Equal Protection clause mandates that similarly situated persons be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). Laws challenged on Equal Protection grounds are subject to one of three levels of scrutiny. *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004). The highest level, strict scrutiny, is reserved for laws that discriminate on the basis of a "suspect class," such as race, or that "impact a fundamental right." *Id.* The second level—intermediate scrutiny—applies to laws discriminating on the basis of gender and is not at issue in this case. *Id.* All other laws are subject to rational basis review. *Id.* (citing *Fitzgerald v. Racing Ass'n*, 539 U.S. 103, 106–07 (2003)). A law survives rational basis review "so long as it bears a rational relation to some legitimate end." *Id.* (citing *Romer v. Evans*, 517 U.S. 620, 631 (1996)).

Turning first to the level scrutiny, Plaintiffs argue the Ordinance is subject to strict scrutiny because it burdens their right guaranteed by the Contracts Clause: "[t]here should be little question that the right guaranteed by federal Contract Clause is 'fundamental.'" (Dkt. No.

---

[8] An organization has standing to bring suit on behalf of its members, provided "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (citing *Hunt v. Wash. State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977)). Although not challenged by the City, the Court acknowledges that Plaintiffs have pleaded the requisite allegations to establish standing to bring suit on behalf of their members in the City of Seattle affected by the Ordinance.

10 at 14; *see* Dkt. No. 28 at 21–23.) Plaintiffs cite to cases from the 19th Century to support the proposition that "[f]or more than two centuries, the Supreme Court has applied this provision to strike down state laws that seek to alter the contractual rights held by private parties." (Dkt. No. 10 at 14.) But this argument is in conflict with more modern jurisprudence. *See, e.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) ("Although it was perhaps the strongest single constitutional check on state legislation during our early years as a Nation, the Contract Clause receded into comparative desuetude with the adoption of the Fourteenth Amendment."); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 436 (1934) ("Every contract is made in subordination to [the laws of the nation], and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur. The Legislature cannot bargain away the public health or the public morals."); *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004). More importantly, Plaintiffs' precise argument—that laws which allegedly impinge on the Contracts Clause are subject to strict scrutiny—appears to be entirely novel: the Court is aware of no authority supporting such a proposition, nor is my esteemed colleague in the Central District of California. *See Cal. Grocers Ass'n*, 2021 WL 736627, slip op. at 6 ("Although it seems implausible that this position is truly unprecedented, neither party cites any authority showing otherwise, nor has the Court uncovered any such case.") The concept of heightened scrutiny has existed for over eighty years, *see U.S. v. Carolene Prod. Co.*, 304 U.S. 144, 152 n.4 (1938), and the Contracts Clause for over two hundred, U.S. Const. art. I, § 10, cl. 1. If the position advanced by Plaintiffs were so straightforward, surely a court would have adopted it by now, but none have done so. *See Cal. Grocers Ass'n*, 2021 WL 736627, slip op. at 6.

   Plaintiffs clarify their position further, arguing that a challenged statute need not *violate* the Contracts Clause to trigger heightened review, but must merely *implicate* it. (Dkt. No. 28 at 23.) Given the difficulty of surviving strict scrutiny review, elevating the Contracts Clause to a "fundamental right" and subjecting any impingement thereupon to strict scrutiny would likely

1   obliterate the ability of government to regulate *any* economic activity at all. To the contrary,

2   courts have routinely applied rational basis review to regulations implicating economic

3   relationships and, by extension, contracts. *See, e.g.*, *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S.

4   307, 313 (1993); *RUI One Corp.*, 371 F.3d at 1154; *Jackson Water Works, Inc. v. Pub. Utilities*

5   *Comm'n of State of Cal.*, 793 F.2d 1090, 1093–94 (9th Cir. 1986); *Int'l Franchise Ass'n, Inc. v.*

6   *City of Seattle*, 803 F.3d 389, 407 (9th Cir. 2015). The Ordinance is subject to rational basis

7   review.

8       Applying rational basis review, the Court must determine whether there is "any

9   reasonably conceivable state of facts that could provide a rational basis for the classification."

10  *Beach Commc'ns, Inc.*, 508 U.S. at 313. "Where there are 'plausible reasons' for [legislative]

11  action, 'our inquiry is at an end.'" *RUI One Corp.*, 371 F.3d at 1154 (9th Cir. 2004) (alteration in

12  original) (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 313–14). Subject to such review, the law

13  survives. Unquestionably, the Ordinance "singles out large retailers and grocery companies."

14  (Dkt. No. 28 at 7.) As justification, the City finds that (1) "top retail companies, including

15  grocery businesses, have earned record-breaking profits during the pandemic," Ordinance,

16  Preamble, (2) that grocery store employees were at significantly heightened risk of contracting

17  COVID-19, Ordinance § 1.J, and (3) compensating grocery employees for the "substantial risks

18  of working during the COVID-19 emergency promotes retention of these vital workers," which

19  is "fundamental to protecting the health of the community." Ordinance § 1.GG. The City also

20  notes that the Ordinance promotes public health, because "[h]igher pay equips workers to

21  purchase more effective personal protective equipment and reduce reliance on public transit."

22  (Dkt. No. 25 at 20–21.)

23      Nor is the Court persuaded by Defendant's argument regarding the City's decision not to

24  apply the law to smaller grocery stores or other frontline businesses. (*See* Dkt. Nos. 10 at 13–14,

25  28 at 7.) As the Ninth Circuit observed when upholding an ordinance that impacted businesses in

26  only one part of the City of Berkeley:

1
2
3
4
5

> Such legislative decisions are "virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 316 (1993). "'[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.'" *Id.* (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)) (finding a rational basis where the state made geographic distinctions to determine tax rates for slot machines).

6  *RUI One Corp.*, 371 F.3d at 1155.

7           Analysis under the Privileges and Immunities Clause[9] of the Washington Constitution,

8  Wash. Const. art. I, § 12, commands a similar result. This clause is frequently construed

9  similarly to the federal Equal Protection Clause, but in certain situations it may require an

10  independent analysis. *See, e.g.*, *Schroeder v. Weighall*, 316 P.3d 482, 485 (Wash. 2014). A claim

11  related to a law regulating wages may constitute such a situation. *Int'l Franchise Ass'n, Inc. v.*

12  *City of Seattle*, 97 F. Supp. 3d 1256, 1284 (W.D. Wash. 2015). The inquiry consists of two steps:

13  (1) whether the law involves a privilege or immunity under the state constitution and, if so, (2)

14  whether there is a reasonable ground for it. *Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 475

15  P.3d 164, 171 (Wash. 2020).

16           The "privileges" referred to in this analysis refer only to "fundamental rights of

17  citizenship." *Ockletree v. Franciscan Health Sys.*, 317 P.3d 1009, 1015 (Wash. 2014).

18  Assuming, *arguendo*, that the Contracts Clause of the Washington Constitution *does* constitute a

19  privilege or immunity, *and* that it is implicated here, the City need only have a "reasonable

20  ground" for the distinctions it draws in the Ordinance. *Id.* at 1017. To establish reasonable

21  grounds, the distinctions drawn "must rest on real and substantial differences bearing a natural,

22  reasonable, and just relation to the subject matter of the act." *Id.* (internal quotation omitted).

23  Here, the decision to apply the Ordinance only to large grocery stores constitutes such a

24  reasonable ground bearing a natural, reasonable, and just relation to its subject matter, given the

25
26  ─────────────────────
           [9] Sometimes referred to as the "Equal Protection Clause" to mirror its federal counterpart. *See Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 475 P.3d 164, 168 (Wash. 2020).

City's findings that large grocery businesses have earned record profits during COVID-19, Ordinance, Preamble, and that grocery store employees are at significantly heightened risk of contracting COVID-19, Ordinance § 1.J. This is a reasonable grounds for the distinctions drawn in the Ordinance.

Accordingly, the Court FINDS that a rational basis exists for the City's classifications and, as a result, the Ordinance does not violate the Equal Protection clauses in the federal or state constitutions.

     3.   The Contracts Clauses of the Federal and Washington Constitutions Do Not Invalidate the Ordinance

Finally, Plaintiffs contend that the Ordinance unconstitutionally impairs their contracts and, as a result, is invalid under the Contracts Clauses of the U.S. and Washington constitutions. (Dkt. Nos. 1 at 11; 28 at 14–15, 24–25.)

The Contracts Clause of the U.S. Constitution provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10, cl. 1. "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (internal quotation omitted). *See also Home Bldg. & Loan Ass'n*, 290 U.S. at 428 ("[T]he prohibition [on impairment of obligation of contracts] is not an absolute one and is not to be read with literal exactness like a mathematical formula."). Instead, to assess whether a law "crosses the constitutional line", the court applies a two-step test. *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). The court considers (1) "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship," and (2) "[i]f the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation." *Energy Reserves Grp., Inc.*, 459 U.S. at 411 (internal quotations and citations omitted). "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the

1   rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of

2   a character appropriate to the public purpose justifying [the legislation's] adoption." *U.S. Trust*

3   *Co. v. New Jersey*, 431 U.S. 1, 22 (1977). Unless the State is a contracting party, "[a]s is

4   customary in reviewing economic and social regulation . . . courts properly defer to legislative

5   judgment as to the necessity and reasonableness of a particular measure." *Id.* at 22–23.

6        Plaintiffs argue the Ordinance substantially interferes with its contracts without any

7   significant or legitimate public purpose, and that even if the City demonstrates such a purpose,

8   the means it chose are neither reasonable nor necessary. (Dkt. No. 1 at 11.) They argue (1) "a

9   wage enhancement does not mitigate risks of exposure to a virus," (2) the Ordinance does not

10  relate to any concerns of economic insecurity, and (3) it will not serve to improve worker

11  retention. (Dkt. Nos. 10 at 17, 28 at 21).[10]

12        First, the Court cannot properly assess whether the statute "substantially impairs"

13  Plaintiffs' members' contracts, as Plaintiffs have provided no specific allegations of contracts or

14  contractual terms which the Ordinance might impair. *See, e.g.*, *Gen. Motors Corp. v. Romein*,

15  503 U.S. 181, 186 (1992) (holding that specific contractual terms must be substantially impaired

16  to give rise to a violation under the Contracts Clause); *RUI One Corp.*, 371 F.3d at 1147 (similar

17  holding). In addition, whether the employer has been subject to previous regulation in the

18  affected area is a relevant consideration in determining whether a substantial impairment has

19  occurred. *See Energy Reserves Grp., Inc.*, 459 U.S. at 413; *Spannaus*, 438 U.S. at 249; *In re Est.*

20  *of Hambleton*, 335 P.3d 398, 413 (Wash. 2014) ("[A] party who enters into a contract regarding

21  an activity 'already regulated in the particular [way] to which he now objects' is deemed to have

22  contracted 'subject to further legislation upon the same topic.'") (alterations in original) (quoting

23

24        [10] Plaintiffs also seem to argue that any impairment is invalid because it is not based on a
    legitimate exercise of a police power, but the claim of illegitimacy seems premised on the

25  success of the Plaintiffs' primary claims, *i.e.*, that a police power that is preempted, violates
    equal protection, or violates the Contracts Clause is illegitimate. (Dkt. No. 28 at 23–24.) This

26  circular reasoning fails because the Court does not find such violations.

ORDER
C21-0142-JCC
PAGE - 14

1   *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940)). While the Court

2   agrees with Plaintiffs that the grocery industry is not so heavily regulated as the companies at

3   issue in *Energy Reserves*, neither is it the case that City inserted itself into "a field it had never

4   sought to regulate," as the Minnesota Legislature did in *Spannaus*. Further, the law in *Spannaus*

5   created entirely new contractual obligations with retroactive effect. 438 U.S. at 249. Neither is

6   true here: the store employees were already subject to state and local minimum wage laws, and

7   the Ordinance has no retroactive effect.

8        Even assuming, *arguendo*, that Ordinance does "substantially impair" Plaintiffs'

9   contracts, the law would still survive. Plaintiffs do not seem to contest that the City has a

10  legitimate interest in the health and safety of frontline workers, including grocery employees,

11  and in particular, protecting them from coronavirus infection. (*See* Dkt. No. 28 at 21.) The City

12  argues that the Ordinance accomplishes that by "equip[ing] workers to purchase more effective

13  personal protective equipment and reduce reliance on public transit." (Dkt. No. 25 at 21.) They

14  further argue that compensating grocery employees for the "substantial risks of working during

15  the COVID-19 emergency promotes retention of these vital workers," which is "fundamental to

16  protecting the health of the community." Ordinance § 1.GG. These are the sorts of "significant

17  and legitimate" public purposes required to survive a Contracts Clause analysis, and the Court

18  will follow the directive of the Supreme Court to "defer to legislative judgment as to the

19  necessity and reasonableness of a particular measure" in cases where the state is not a

20  contracting party. *U.S. Trust Co.*, 431 U.S. at 22.

21       Similarly, no independent inquiry is required for purposes of the Contracts Clause

22  contained in the Washington constitution, as it is "coextensive and . . . given the same effect" as

23  the clause contained in the U.S. Constitution. *Dep't of Lab. & Indus. of State v. Lyons Enters.,*

24  *Inc.*, 347 P.3d 464, 474 (Wash. App. 2015), *aff'd*, 374 P.3d 1097 (Wash. 2016).

25       Plaintiffs fail to state a claim based upon a Contracts Clause violation.

26

ORDER
C21-0142-JCC
PAGE - 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**III.     CONCLUSION**

For the reasons described above, the Court GRANTS Defendant's motion to dismiss (Dkt. No. 23). Plaintiffs' complaint is DISMISSED with prejudice and without leave to amend, as any amendment would be futile. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Plaintiffs' motion for preliminary injunction (Dkt. No. 10) is DENIED as moot.

DATED this 18th day of March 2021.

John C. Coughenour
UNITED STATES DISTRICT JUDGE